EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JULIO PACHECO PADILLA, acusado y apelante.

*Número:* CR-65-164    *Resuelto:* 9 de diciembre de 1965

*Elí B. Arroyo*, abogado del apelante; *J. B. Fernández Badillo, Procurador General*, y *J. F. Rodríguez Rivera, Procurador General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

El apelante fue acusado de yacer con una muchacha a quien le faltaban unos meses para cumplir catorce años. Para sostener la acusación el fiscal presentó la prueba que a continuación relatamos. El primer testigo afirmó que el 6 de diciembre de 1963 vio que la joven que se alega ultrajada "tenía un pequeño papel en las manos y así por una ventana, pues le pasó el papel aquí al señor". El fiscal pregunta "¿A este señor?" y la respuesta es "Sí".[1] El segundo testigo declaró que el acusado le pidió que lo llevara en su automóvil a Aguadilla, entonces "llegamos a un sitio, a un bar en San Sebastián y entonces nos paramos allí y estuvimos un rato y al poco rato él fue y llegó con una muchacha" "entonces se montaron en el carro y yo los traje, me dijo 'llévame a

---

[1] Se supone que se refiera al acusado, pero no hay indicación positiva de que así sea. El récord no apunta que señaló al acusado.

Aguadilla'." Cuando iban en dirección a Aguadilla el acusado le dijo que lo llevara por el desvío ". . . yo seguí por ahí y al llegar al Magic Lamp él me dijo que lo dejara allí". Declaró que dejó al acusado y a la muchacha frente al Magic Lamp, en la calle. El fiscal le pregunta si "a la niña ésta la ha visto en la Corte hoy" y contesta "Sí, la vi allí". El fiscal comenta "Sujeto Vuestro Honor, a más adelante cuestión de identificación, hemos terminado con el testigo".

La supuesta perjudicada declaró que tenía trece años (le faltaba cuatro meses para cumplir 14 años), que el 6 de diciembre el acusado fletó un carro a un amigo a quien identificó en el público señalando a una persona que usaba una camisa lila, para que los llevara al motel Magic Lamp, que cuando llegaron al motel, el acusado entró a la barra y habló con una señora, luego vino a buscarla al automóvil y la llevó al motel a la habitación # 2 y "Como allí en el motel Magic Lamp hay como una vellonerita pegada al seto, pues empezamos a echar discos y a bailar" después "nos acostamos y tuvimos relaciones" "unas cuantas veces". Estuvieron tres días en el motel, de allí pasaron a otro hotel en Arecibo donde estuvieron dos días. Finalmente el acusado la llevó a casa de su padre(²) en Hormigueros.

El Dr. Francisco A. Márquez examinó a la perjudicada el día del juicio, 13 de mayo de 1964 y declaró que no era virgen y que la desfloración había ocurrido hacía más de diez días.

El padre de crianza de la perjudicada declaró que la joven desapareció el 6 de diciembre por la noche, y no la volvió a ver hasta el 14 cuando el acusado informó que ésta estaba en Mayagüez. Declaró además que a los tres o cuatro días de haber desaparecido fue a la Base Ramey donde trabaja el acusado para preguntarle dónde estaba y que éste le

---

(²) La perjudicada vive en San Sebastián con su madre casada en segundas nupcias.

contestó que si no hubiera sido por el revolú que había formado le hubiera dicho dónde estaba.

La madre declaró que vio al acusado el 6 de diciembre cerca de su casa, en una tienda, que como a las 7:30 de esa noche "fue a llevarle la comida a su esposo y al regresar no encontró a su hija." La volvió a ver en la Corte en ocasión de la investigación. Declaró que su hija antes de ese día se había desaparecido en otra ocasión con otro hombre.

Durante el contrainterrogatorio de la perjudicada la defensa pregunta: "¿Qué fue lo que hicieron ustedes allí en el Magic Lamp, que es lo que tú llamas relaciones sexuales, vamos a ver?" El abogado formula esta pregunta ya que en el examen directo la perjudicada se ha limitado a expresar que tuvo relaciones sexuales con el acusado. Al formularse la pregunta el juez interviene y expresa lo siguiente: "Usted puede explicar, nena, dígame a mí, mire, atiéndame. Usted puede explicar; puede explicar sí o no?" A lo que la joven contesta "Yo no me atrevo". El juez entonces resuelve no permitir que continúe el contrainterrogatorio. La defensa anota su protesta.

■ Si bien es verdad que con la expresión de haber tenido relaciones sexuales generalmente queda establecido ese hecho por saberse lo que ello significa, *Pueblo* v. *Colón*, 81 D.P.R. 814 (1960); *State* v. *Moorer*, 129 S.E.2d 330 (S.C. 1963); *State* v. *Waters*, 135 N.W.2d 768 (Wis. 1965), si la defensa insiste en contrainterrogar para que se explique, constituye error impedirlo.

■ El derecho a contrainterrogar un testigo es uno fundamental en la celebración de un juicio justo e imparcial. Lo consagra la Sec. 11 de la Carta de Derechos de nuestra Constitución cuando expresa que todo acusado tiene derecho "a carearse con los testigos de cargo". Es el medio que tiene la defensa para descubrir la verdad. Privarlo de ese derecho en relación con uno de los ingredientes principales en la comisión de un delito es error que conlleva la revocación de

la sentencia. Haber consumado el acto sexual es el ingrediente principal en el delito imputado al apelante. No permitir que la defensa ahondara en ese aspecto para averiguar si en verdada se había consumado el acto, perjudicó al acusado.

La Corte Suprema de California en *People* v. *Howard*, 76 Pac. 1116 (1904) se expresó así al revocar un caso de violación, por no haberse permitido contrainterrogar a la perjudicada en relación con su edad:

". . . La facultad de contrainterrogar es uno de los vehículos más eficaces reconocidos por el derecho para el descubrimiento de la verdad. Constituye un error que da lugar a la revocación el privar a un acusado de este derecho en un caso apropiado en relación con hechos pertinentes y cuando el contrainterrogatorio se contrae a materia que fue objeto del interrogatorio directo. Siempre es procedente contrainterrogar a un testigo sobre todos los hechos y circunstancias relacionadas con su testimonio en el interrogatorio directo."

En *People* v. *Boardman*, 205 Pac. 877 (Cal. 1922) surgió una situación parecida a la del presente caso y se revocó la sentencia en apelación. Véase además *People* v. *Swanson*, 22 Cal. Rptr. 178, 181 (1962).

Recientemente la Corte Suprema de los Estados Unidos expresó en *Pointer* v. *Texas*, 380 U.S. 400 (1965):

" . . . Resolvemos hoy que el derecho de un acusado a carearse con los testigos en su contra consagrado por la Enmienda Sexta es igualmente un derecho fundamental que debe ser respetado por los estados por vía de la Enmienda Décimocuarta.

"A estas alturas no puede discutirse seriamente que el derecho a contrainterrogar está incluido en el derecho de un acusado a carearse con los testigos contrarios. Y probablemente nadie, ciertamente ninguna persona con experiencia en procesos, negará el valor del contrainterrogatorio como arma para desvirtuar la falsedad y establecer la verdad en un proceso criminal . . . . El que este derecho aparezca en la Enmienda Sexta de nuestra Carta de Derechos demuestra la convicción de los padres de estas libertades y salvaguardas que la confrontación era un derecho fundamental esencial para un juicio imparcial en una causa

criminal. Además, las decisiones de esta Corte y otros tribunales, a través de los años, han enfatizado constantemente la necesidad del contrainterrogatorio como una protección para los acusados en casos criminales."

■ Erró también el juez al instruir al jurado. Veamos. Uno de los testigos de cargo, el padrastro de la perjudicada, afirmó que el apelante le había manifestado a los dos o tres días de haberse desaparecido la perjudicada que si "no hubiese sido por el revolú . . . [le] hubiese dicho donde estaba la niña". Refiriéndose a estas manifestaciones el juez instruye al jurado en la siguiente forma:

"Esas manifestaciones de que el testigo declara de que le dijo el acusado pudieran considerarse tal vez como una admisión, y esas admisiones son admisibles como prueba si no fueron obtenidas mediante amenaza o promesa, sino que fueran hechas voluntariamente, sin coacción de clase alguna; y es lo que en Derecho se habla como admisiones o manifestaciones en relación a un asunto. No podemos definirlo como una confesión porque una confesión en Derecho Penal es una admisión o una manifestación por una persona acusada de un delito al efecto de que es culpable del mismo. La admisión se distingue de la confesión en el hecho de que el término 'admisión' en materia penal se refiere a un hecho específico que pudiera ser específico o aislado, o ambos términos conjuntamente, que tiendan a establecer la culpabilidad de/o algún elemento del delito, mientras que la confesión es más amplia. Es el reconocimiento pleno de la culpabilidad. La confesión es el reconocimiento pleno de la culpabilidad. La admisión, repito, se refiere a algún hecho específico que tienda a establecer la culpabilidad o algún elemento del delito. Claro está, al considerar esto que catalogaríamos como manifestaciones hechas por el acusado a este testigo, ustedes tienen que considerar, primero, si realmente creen que en verdad se hicieron esas admisiones, y después si ustedes creen que eso puede corroborar el testimonio de la perjudicada. Quiere decir, que no se va a resolver el caso por lo que la perjudicada nada más dijo, sino que van a resolver si el resto de la otra prueba da bastante para creer todo lo que dice la perjudicada. Si da bastante para darle crédito a todo lo que dice la perjudicada, y eso es importante y esencial, dicen bueno, pues nosotros le creemos a esta niña porque también le

creemos al otro testigo que dijo primero que la dejó en ese sitio. También le creemos a esta niña porque le creemos al testigo que dijo que el acusado dijo que no decía donde estaba por tal circunstancia, y que porque el acusado más tarde se refirió a donde estaba la niña."

En forma alguna puede sostenerse que esas manifestaciones del apelante constituyen una admisión del delito de violación que se le imputó. Y además el juez instruye al jurado en el sentido de que esas manifestaciones pueden constituir la corroboración requerida al testimonio de la perjudicada. Esto claramente fue un error. Véase *Pueblo v. Crespo Guerrero*, 90 D.P.R. 217 (1964).

*Lo expuesto hace innecesario considerar los otros fundamentos aducidos para que revoquemos la sentencia apelada. Se revocará la sentencia que dictó el Tribunal Superior, Sala de Aguadilla y se devolverá el caso para la celebración de un nuevo juicio.*

