EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* MARTÍN MELÉNDEZ SANTIAGO, acusado y apelante.

*Números:* CR-65-492      *Resueltos:* 2 de noviembre de 1966
            CR-65-493
            CR-65-494

*Elizabeth A. de Watlington,* abogada del apelante; *J. F. Rodríguez Rivera, Procurador General Interino,* e *Irene Curbelo, Procuadora General Auxiliar,* abogados de El Pueblo.

PER CURIAM: El Fiscal formuló dos acusaciones contra el apelante por los delitos de asesinato perpetrados en las personas de su esposa Juana Rosado Rojas y en la hermana de ésta, Carmen María Rosado Rojas. Además se le acusó de una infracción al Art. 4 de la Ley de Armas.

La prueba de cargo presentada en el juicio tendió a demostrar que el 31 de diciembre de 1961, el acusado, quien hacía cuatro meses estaba separado de su esposa Juana Rosado Rojas, se presentó en la casa de ésta sita en el barrio Hato Tejas de Bayamón. Allí se encontraban además de Juana, una hermana de ésta llamada Carmen María Rosado Rojas y varios niños de ambos. El acusado solicitó ver a su hija menor y su esposa Juana le contestó que sólo podía verla desde la puerta. El acusado entró y con un cuchillo estilo puñal hirió repetidas veces a Carmen María Rosado Rojas. La esposa de aquél, Juana, huyó de la casa y regresó con un pedazo de alfajía con la cual golpeó al acusado en la cabeza. El acusado también le infirió varias heridas a su esposa Juana. Luego abandonó la casa, limpió el cuchillo ensangrentado y huyó por un platanal. Las dos hermanas Juana y Carmen María Rosado Rojas fallecieron a consecuencia de las varias heridas incisas, cortantes y punzantes, que les infirió el acusado.

El mismo día de los hechos el acusado prestó ante el Fiscal una declaración jurada, cuyo resumen hace correctamente el Procurador General, en los siguientes términos:

"Estaba casado con la occisa, Sra. Juana Rosado, pero separado de ella hacía unos cuatro meses. Ella vivía en Hato Tejas con el Sr. Benito Mercado; él vivía en Cataño. El 31 de diciembre de 1961 como a las 12:30 de la tarde se dirigió hacia Hato Tejas en Bayamón con el fin de llevarle unas cosas a sus hijos. Se había enterado que su cuñada, la occisa, Carmen María Rosado había ido a visitar su hermana Juana y pensó que de una vez podía resolver el problema, es decir, que podía matarlas a las dos. Había concebido la idea de matarlas hacía un mes: a Carmen María porque tres meses atrás ella le había metido una vela a su nena de 4 años y medio con el propósito de acusarlo de violación; a Juana porque ésta no le permitía ver a sus hijos. Cuando salió de su casa en Cataño llevaba consigo una cuchilla de doble filo estilo bayoneta de 10″ a 12″ de largo. Lo portaba en una bolsa de papel. Hirió primera a Carmen quien, una vez herida, se le abalanzó encima y después salió corriendo. Se acercó Juana y le propinó un golpe en la cabeza con un palo. A ésta también la apuñaló. El acusado huyó y durante la huída perdió el cuchillo. Se entregó voluntariamente." (Informe del Procurador General, pág. 2.)

Además de la confesión escrita se presentó como prueba unas manifestaciones hechas por el acusado al alguacil del Tribunal Superior, Sala de Bayamón, Sr. Juan Ramón Rivera Ayala. Veamos el récord.

"Hon. Fiscal:

P. ¿Cómo se llama?

R. Juan Ramón Rivera Ayala.

P. ¿Dónde vive?

R. Resido en la Calle de Pájaros del Barrio Hato Tejas, Bayamón.

P. ¿Tiene la bondad de decirme si conoce a Martín Meléndez Santiago?

R. Si, señor.

P. ¿En ocasión a qué lo conoció?

R. El día 31 de diciembre de 1961, como a las tres y cuarenticinco de la tarde tuve la oportunidad de conocerlo a él en la finca de mi casa.

P. ¿Dónde radica la finca de su casa?

R. Barrio Hato Tejas de Bayamón.

P. ¿Tuvo oportunidad de conversar con él?

R. Hablé con él.

P. Diga a las damas y caballeros del jurado qué le dijo o usted le preguntó.

R. Ese día, como dije anteriormente, de 3:45 a cuatro de la tarde, este señor era conducido por la policía de Bayamón en el coche celular a la finca del papá mío, que radica en el Barrio Hato Tejas. Al ver entrar la 'patrol' y la guagua de la policía fui inmediatamente a ver qué era lo que ocurría. Entonces bajaron al señor acusado de la 'patrol' frente a la lechería que tiene mi padre en la misma finca y le dije que me había enterado de lo que había ocurrido. Le dije: mire, sé que ha cometido dos delitos graves, cuyos delitos conllevan pena de presidio. Tiene dos perpetuas. Me dijo que a él le interesaba poco que fueran dos o veinte perpetuas toda vez que él mató dos mujeres y si volvían a vivir las mataba otra vez.

P. ¿Cómo se veía él?

R. Se veía tranquilo." (T.E. págs. 156 a 158.)

El único testimonio de defensa fue el del propio acusado. Dijo que el día de los hechos fue a la casa de su esposa para ver a su hija menor; que hacía cuatro meses estaba separado de su esposa y ésta había interpuesto demanda de divorcio a la cual él se opuso; que durante ese tiempo no le había permitido ver a sus hijos. Lo recibió su cuñada Carmen María Rosado quien le dijo que si no se iba le "entraría a palos"; que el acusado insistió en ver a su hija y Carmen Rosado se le abalanzó encima; mientras luchaba con ella entró su esposa Juana y lo golpeó con un palo por la cabeza causándole una herida. A preguntas del fiscal declaró que después que Juana Rosado lo golpeó se percató de un cuchillo colocado sobre la mesa, lo empuñó y apuñaló a sus asaltantes. Dijo además que no se acordaba de haber hecho las manifestaciones que aparecen en la declaración jurada prestada ante el fiscal. Dijo además que no conoce al Sr. Juan Ramón Rivera Ayala y negó que le hubiera hecho las manifestaciones que éste le atribuye.

El jurado le halló culpable de asesinato en primer grado en los dos casos y el Tribunal le condenó a reclusión perpetua

en cada uno de ellos. Por infracción a la Ley de Armas fue sentenciado a cumplir un año de cárcel.

Apeló de las sentencias señalando la comisión de cuatro errores, el primero de los cuales lo enuncia así:

"Primer Error: Erró el Tribunal de Instancia al instruir al jurado que la admisión del acusado hecha al testigo Juan Ramón Rivera Ayala constituía una confesión de los delitos imputados."

Transcribiremos del récord las instrucciones trasmitidas al jurado en relación con las admisiones hechas por el acusado al testigo Rivera Ayala. Veamos.

"Se me olvidaba decir que por voz de un testigo de nombre Juan Ramón Rivera Ayala, *se produjo otra alegada confesión del acusado.* Para que tomen en consideración también esas alegadas manifestaciones que ha dicho este testigo que oyó de labios del acusado, es necesario que ustedes estén convencidos que esas manifestaciones fueron voluntariamente expresadas. Es decir, *que esa confesión que vino a través de este testigo* tiene también que ser voluntaria y deben estar convencidos de que fue voluntariamente hecha para que puedan considerarla. *Y para determinar si esa confesión hecha por el acusado* al testigo Rivera Ayala fue voluntaria deben ustedes aplicar las mismas reglas que ya les he explicado. Naturalmente, *en relación con esa confesión* hay un testimonio contradictorio del acusado, que ha negado haber dicho la frase. Habrán de resolver ustedes, como cuestión de hecho, como una determinación de hecho con la prueba presentada. Pueden resolver, después de examinar la prueba, que el acusado no hizo las manifestaciones o que si las hizo las hizo en forma involuntaria o si las hizo voluntariamente. Si estiman que no las hizo o las hizo en forma involuntaria o si tuvieran duda de si las hizo en forma voluntaria, vienen obligados a rechazarlas y no considerarlas. Unicamente vienen obligados a considerar la prueba si determinan que las hizo y las hizo voluntariamente." (Pieza II, Instrucciones, págs. 16–17.) (Subrayado nuestro.)

Para enfatizar aun más que las manifestaciones hechas por el acusado al testigo Rivera Ayala, constituían una confesión, el juez le llama primera confesión a la escrita y segunda confesión a la oral. Dijo el magistrado al jurado:

"Damas y caballeros del jurado, la confesión escrita que se les leyó a ustedes y que está en evidencia y que considerarán tomando en cuenta las reglas que les he dicho, según la prueba aparece prestada por el acusado con anterioridad a *la alegada confesión* que vino a la consideración del jurado por voz del testigo Rivera. Debo instruirles en ese sentido que si ustedes, después de analizar la confesión escrita que oyeron y de estudiar las circunstancias que rodearon el pronunciamiento de esa confesión, determinaran que hubo circunstancias ajenas a la voluntariedad del acusado que invalidan esa confesión escrita y como consecuencia de ese convencimiento de ustedes rechazan esa confesión escrita, entonces surgirá un convencimiento al efecto de que las mismas *circunstancias que invalidan la confesión escrita estaban presentes cuando se produjo la confesión oral.* Si creen que la confesión oral se produjo, y lo creen más allá de duda razonable; entonces tendrán que determinar y convencerse más allá de duda razonable si las circunstancias esas que invalidaron por involuntaria la primera confesión escrita, estaban presentes todavía, estaban latentes al momento *de producirse la confesión oral* o si por el contrario esas circunstancias no estaban presentes y habían cesado. En todo caso, si como cuestión de hecho ustedes determinaran que la primera confesión fue involuntaria, deberán determinar, como cuestión de hecho, si lo que les indujo a rechazar la primera confesión *estuvo presente en la segunda confesión.* Si entienden que esas circunstancias estaban presentes *en la segunda confesión,* es vuestra obligación rechazar la segunda confesión. Únicamente cuando estén convencidos de que cesaron esas circunstancias es que se puede tomar en consideración y se puede determinar *que la confesión oral es voluntaria para tomarla en consideración como prueba contra el acusado."* (Pieza II, Instrucciones al Jurado, págs. 20 a 22.) (Subrayado nuestro.)

Tiene razón el apelante al sostener que sus manifestaciones al testigo Rivera Ayala constituían una admisión de haber dado muerte a las dos víctimas pero que no constituían una aceptación de todos los elementos del delito de asesinato en primer grado. Admitir que se ha dado muerte a una persona no implica que se admita que esa muerte se ocasionó con malicia, deliberación y premeditación. El Procurador General así lo reconoce y por considerar, como con-

sideramos nosotros ahora, que el error cometido es de tal naturaleza perjudicial al acusado, se allana a la revocación de las sentencias, conforme a la doctrina del caso de *Pueblo v. Crespo Guerrero,* 90 D.P.R. 217 (1964) donde dijo este Tribunal:

"Instruir al jurado, en cualquier caso, que un testimonio es una confesión del acusado, que en derecho significa que ha admitido o reconocido de manera absoluta los hechos y elementos esenciales del delito que se le imputa, sin que en ley sea una confesión, constituye un grave error de derecho que amerita la revocación de la sentencia.

"Una vez que el Juez instruyó al jurado que la declaración de Otero constituía una confesión del apelante, les transmitió la noción y su criterio de que éste aceptaba el haber cometido los hechos imputados en la acusación, cosa ésta perjudicial, particularmente en cuanto a la determinación de si el acusado cometió un asesinato de primer grado o uno de segundo grado en vista de la única otra evidencia sobre los hechos. Sólo quedaba al jurado pasar sobre el factor de credibilidad del testigo y de la voluntariedad de la llamada confesión, hecho éste que no presentaba controversia. El testimonio de Clemente Otero Ortiz debió haber sido considerado por el jurado libre de todo comentario, conclusión, adjetivación o criterio de parte del Juez, debiendo ese cuerpo como único juzgador de los hechos justipreciar dicho testimonio y derivar del mismo las inferencias y conclusiones apropiadas." . . . (Informe Procurador General, págs. 7 y 8.)

Como el error cometido conlleva la revocación de las sentencias es innecesario considerar los demás señalamientos.

*Se revocarán las sentencias apeladas y se ordenará la celebración de un nuevo juicio.*