El Pueblo de Puerto Rico, demandante y apelado, *v.* Abdalla Sulman, acusado y apelante.

*Número:* CR-74-23    *Resuelto:* 24 de febrero de 1975

*Benigno Alicea Alicea*, abogado del apelante; *Myriam Naveira de Rodón, Procuradora General, Peter Ortiz, Procurador General Interino, y Héctor R. Orlandi Gómez, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR CADILLA GINORIO emitió la opinión del Tribunal.

El apelante fue acusado de asesinato en primer grado porque el 11 de junio de 1969 causó la muerte a María Rivera Figueroa. Por los mismos hechos fue acusado de violación a los Arts. 8 y 6 de la Ley de Armas.

La vista del caso comenzó ante jurado el 12 de febrero de 1970 en la Sala de San Juan del Tribunal Superior de Puerto Rico (Hon. Antonio Rivera Brenes, J.). El Pueblo estuvo representado por su fiscal, Hon. Teodoro Méndez Lebrón. El

acusado estuvo presente y representado por los Lcdos. Luis Cerra Carreira y Luis A. López Olmedo, de la Sociedad Para Asistencia Legal.

Una moción para que se suspendiera la vista del caso por no estar preparada la defensa fue declarada sin lugar, al igual que un planteamiento respecto al grado del delito imputado.

Desfilada la prueba de las partes, el tribunal de instancia declaró con lugar una moción de absolución perentoria en cuanto a la acusación por infracción al Art. 8 de la Ley de Armas.

El jurado rindió un veredicto de culpabilidad del Delito de Homicidio Voluntario, por mayoría de 9 a 3. El juez lo declaró culpable de una violación al Art. 6 de la Ley de Armas.

El 27 de mayo de 1970 la Corte sentenciadora le impuso al apelante una condena de 6 a 10 años de presidio en el caso de Homicidio Voluntario y 8 meses de cárcel en el caso del Art. 6, ambas penas a cumplirse consecutivamente.

Para sostener su apelación ante nos, el apelante alega que el tribunal de instancia cometió los errores siguientes:

"PRIMER ERROR: Incidió la Sala de Instancia al instruir al jurado que la declaración del acusado 'constituye una confesión del delito de homicidio voluntario en este caso'. (T.E. pág. 257.)"

"SEGUNDO ERROR: Incidió la Ilustrada Sala de Instancia al instruir al jurado contrario a lo dispuesto en *Pueblo* v. *Natal Rojas,* 93 D.P.R. 844 (1967)."

Aunque no lo alega como un error específico, el apelante formula un *"Señalamiento Especial"* en el sentido de que la pena impuéstale no es proporcional al delito cometido.

Para poder determinar si se cometió o no el primer error apuntado, tenemos que referirnos necesariamente a cierta parte específica de la declaración prestada por el acusado durante la celebración del juicio ante el jurado, y a ciertas instrucciones dadas por el ilustrado Magistrado del tribunal de instancia, que presidió la vista del caso.

El acusado se sentó a declarar como testigo en su propia defensa. Su declaración fue amplia. Cubre de la página 171 a la 212, ambas inclusives, de la transcripción de la evidencia. En aquella parte de la misma que está relacionada con el primer error, aparece que el acusado era ciudadano jordano, tenía 22 años de edad, estaba en Puerto Rico desde el año 1965 y se dedicaba a vender oro, prendas y mercancías en general; que era casado con la joven occisa María Jovita Rivera, con la cual se casó el 17 de mayo de 1969; que fueron a vivir a una casa que él había comprado para ellos en la urbanización "Dos Pinos" en Río Piedras, Puerto Rico a principios de 1969; que el día de los hechos, 11 de junio de 1969, (¹) se levantó a las cinco y media de la mañana para irse para su trabajo en Río Piedras, a donde iba en guagua; que a las seis de la mañana, más o menos, salió de su casa para ir a coger la guagua; que al ésta acercarse metió la mano en el bolsillo para pagar el pasaje pero notó que no llevaba dinero encima y regresó caminando a su casa otra vez a buscar el dinero; que entre el tiempo que transcurrió entre el momento que sale de su casa, está esperando la guagua, ésta viene y se da cuenta que no tiene el dinero y regresa, transcurrieron "más o menos treinta y cinco minutos, de treinta a treinta y cinco minutos". (²) Preguntado si al llegar a su casa, hizo algo, dijo: "Cuando llegué a la puerta de la marquesina busqué en mis bolsillos y no encontré la llave del candado y tuve que dar la vuelta, brincar una verja y entrar por una puerta corredora. (³) Que esa puerta daba adentro de su casa; que entró por la sala, pasó por un pasillo para el cuarto dormitorio, donde usualmente dormía él con su esposa. (⁴)

Al preguntársele por el abogado de la defensa que sucedió, si algo, al llegar a ese cuarto, contestó:

---

(¹) Un mes después de casados.
(²) T.E. pág. 176.
(³) T.E. pág. 176.
(⁴) T.E. pág. 177.

"R. Encontré un hombre acostado con mi esposa en la cama. En la cama en que yo duermo con ella siempre.

En el momento que yo entré al cuarto encontré que los dos estaban en la cama y entonces yo me puse furioso."[5]

Explicando la posición en que estaban acostados los dos, expresó:

"Uno encima del otro. Encontré que el hombre estaba encima de mi esposa y tenía quitada la camisa."[6]

Refirió que el hombre vestía con un pantalón medio amarillo y una camisa azul; y que en la esquina de la cama estaba colgada la camisa de él.

Declaró que no recordaba la ropa que ella tenía puesta, pero que "tenía el traje subido hasta acá arriba". El fiscal le preguntó si pudo percatarse si ella tenía ropa interior puesta y contestó: "Que yo viese eso . . . se me cegaron los ojos, no vi nada, no me di cuenta si tenía ropa interior o no."[7]

El fiscal le preguntó nuevamente, que pasó enseguida que entra al cuarto y se percata de esa situación. El le contesta:

"Ella me estuvo hablando cosas muy malas. Me dijo: 'Este hombre es mi pollo y usted para mí no vale nada, usted se va para el carajo.'

Yo lo empujé a él. Cuando se me cegaron los ojos pensé coger el revólver y matarlos a los dos. Yo lo empujé a él y él me empujó. Cuando vió que yo estaba de mal genio cogió su camisa y se fue corriendo, entonces mi esposa me fue a aguntar, pero no pude sacar el revólver de la gaveta."[8]

Que luego cogió el revólver y "se me subió la sangre a los ojos y empecé a tirar." "Le tiré un tiro al hombre que iba corriendo del cuarto." "Le dí un tiro a la puerta de salida."[9]

[5] T.E. pág. 177.
[6] T.E. pág. 177.
[7] T.E. pág. 178.
[8] T.E. pág. 178.
[9] T.E. págs. 178–180.

¿Que hace usted enseguida que le dispara ese tiro al hombre que huía de su casa?, le pregunta el abogado de la defensa:

"R. Como se había subido la sangre a la cabeza volví directamente al cuarto, comencé a darle tiros a mi esposa y de ahí no me recuerdo más." (9a)

En el curso de sus instrucciones al jurado, al referirse a la declaración del acusado, y específicamente a lo que arriba hemos textualmente copiado de su declaración, el ilustrado magistrado del tribunal de instancia, según aparece a las páginas 256 a 257 ambas inclusive, de la transcripción de evidencia, se expresó en los términos siguientes:

"Caballeros del Jurado, dije al principio que a juicio del Tribunal caben cuatro veredictos en este caso a base del análisis que pueda hacer los señores del Jurado de la prueba desfilada: asesinato en primer grado, en segundo grado, homicidio voluntario o absolución.

Se preguntarán los señores del Jurado por qué puede haber un veredicto de absolución cuando el acusado en la silla de los testigos admitió haber matado a la perjudicada en un arrebato de cólera. Eso es así porque el jurado como tribunal de hechos puede descartar el testimonio del acusado si lo juzga pertinente porque ustedes son los jueces de hechos. Así como también no le puede merecer crédito la prueba del Fiscal y entender que no se ha cometido ningún delito o tuviesen duda razonable y fundada y de suceder eso tendrían que traer en veredicto de absolución. O sea, que el Jurado no está obligado a aceptar los hechos, aceptar que los hechos ocurrieron en la forma exacta expresada en la declaración prestada por el acusado porque eso sería dejar en manos del acusado el esclarecimiento de la verdad. El Jurado es el que juzga, examina, pesa y aquilata toda la prueba. *La declaración del acusado, que constituye una confesión del delito de homicidio voluntario en este caso, es parte de la prueba y el Jurado puede apreciarla a la luz y en relación con el resto de la misma y procederá a actuar en la forma que estimare justa de acuerdo con su consciencia y los principios de ley.* La regla de que una confesión debe considerarse en toda su integridad, no obliga al Jurado a dar el mismo crédito a cada parte de

---

(9a) T.E. págs. 179–180.

ella. El Jurado puede creer la parte que estime digna de crédito y rechazar cualquier porción que no le merezca confianza." (Bastardillas nuestras.)

El apelante impugna la referida instrucción al jurado de que la declaración del acusado *"constituye una confesión del delito de homicidio voluntario en este caso."* (T.E. pág. 257.).

Admite que en su propia declaración o testimonio en su propia defensa admitió que había dado muerte a su esposa María Jovita Rivera Figueroa.[10] Sostiene que tal admisión la consideró el Magistrado de Instancia como la confesión de un delito—homicidio voluntario—y así se dejó saber al jurado; pero que era éste a quien correspondía hacer las inferencias y conclusiones—a tenor con las instrucciones que sobre la ley aplicable al caso les impartiera el tribunal—razonables y permisibles, sobre el delito, si alguno, había cometido el apelante, después de apreciar toda la prueba presentada. Alega que está vedado al juez decir al jurado, como hizo en el de autos—qué delito cometió el acusado—que era el jurado quien tenía que considerar el testimonio del apelante en conjunto con el resto de la prueba presentada, libre de todo comentario, conclusión, adjetivación o criterio de parte del juez; y que la apreciación que de la prueba hizo la Ilustrada Sala de Instancia no debió trasmitirse al jurado, so pena que el derecho constitucional del apelante a juicio por jurado fuera violado. Invoca el caso de *Pueblo* v. *Crespo Guerrero*, 90 D.P.R. 217 (Santana Becerra) (1964). Se trata en ese caso de una sentencia del Hon. Jorge Meléndez Vela, J. (Bayamón) condenando al allí acusado por los delitos de asesinato en primer grado y por acometimiento y agresión grave.

El día de los hechos, la testigo Adelina Vega Robles estaba en su casa efectuando unos quehaceres domésticos cuando vió a una persona parada en un guayabal, mirando hacia su casa. Nunca antes la testigo había visto a esa person y nunca antes

---

[10] Alegato apelante, pág. 6.

la había conocido. En corte la identificó como el acusado Amador Crespo Guerrero. Dicha persona parada dentro del guayabal, sostenía en la mano un bulto como una funda de papel. La casa de Adelina estaba situada a orilla de la carretera a Toa Baja en Bayamón, y la finca donde vió al acusado estaba al otro lado opuesto de la carretera. Este miraba hacia el hogar de Adelina y la citó por dos veces. En la segunda vez ella le preguntó desde el pasillo qué deseaba y el hombre le contestó que allí adentro había unos huevos. Le dijo ella que los dejara que eran de sus gallinas que ponían por allí. Al oir esta conversación, Margarita Ortíz Rosario, sobrina del marido de Adelina, una mujer enferma, de unos cuarenta años de edad, que con frecuencia se iba a la casa de Adelina y quien ese día estaba acostada allí, en la cocina, le dijo a Adelina que iría a buscarlos. Esta le dijo que no fuera, pero Margarita se levantó, cruzó la carretera, pasó un alambre de púas y se dirigió al sitio donde estaban los huevos. El acusado iba delante y detrás Margarita. Adelina se fue detrás siguiéndolos a poca distancia. Al llegar junto a ellos el acusado y Margarita estaban parados, como a cuarenta pies de la casa. Ella le dijo a Margarita que se viniera. En el acto el acusado dió un paso hacia Adelina y le tiró un golpe con un objeto que estaba envuelto en papel. Ella sacó la cabeza y el golpe le dió en el mollero haciéndola falsear un poco. El acusado entonces atacó a Margarita con el mismo objeto sobre la región del mastoides derecho. Con el golpe Margarita cayó al suelo y el acusado se fue por el guayabal hacia adentro. Hubo un solo golpe. Adelina corrió pidiendo auxilio y un señor que pasaba la ayudó a socorrer a la víctima que estaba tendida en el suelo botando una sanguaza por la boca y la nariz. Los huevos estaban allí y allí estaba el objeto. La testigo lo recogió, lo desenvolvió y vio que era un tubo; en el juicio, luego de identificarlo, fue admitido en evidencia como el objeto con que se cometió el crimen. Margarita fue llevada al hospital de Toa Baja y poco después murió. La

autopsia practicada demostró que el golpe produjo una hematoma interior en la masa encefálica que afectó los centros cardiorespiratorios del cerebro, lo que produjo la muerte. La declaración de la testigo Adelina Vega Robles fue la única evidencia producida durante el primera día del juicio en cuanto a los hechos. La otra prueba versó sobre la autopsia. Hasta el momento en que recesó el tribunal ese primer día el récord no revelaba un motivo para el crimen. Otras circunstancias en los autos, tomadas en conjunto, no nos inclinaron a creer la existencia de un motivo sexual o lujurioso y aparentemente tampoco un motivo de robo.

El segundo día de juicio, al reunirse el tribunal, el fiscal solicitó el retiro del jurado, lo cual se ordenó y llamó entonces al testigo Clemente Otero Ortiz.(11) Anunció el fiscal que trataría de probar la voluntariedad de una confesión hecha por el acusado a dicho testigo Otero Ortíz.

El juez oyó el testimonio de dicho testigo Clemente Otero Ortíz y resolvió que se trataba de una confesión hecha por el acusado a dicho testigo. Con tenaz oposición de la defensa, ordenó que esa prueba fuera oída por el jurado. Ante el jurado, y a preguntas del fiscal, dicho testigo Clemente Otero Ortíz, declaró en síntesis: Que conoció al acusado Amador Crespo Guerrero el día en que empezó a ventilarse el juicio; que en el primer día del juicio tuvo una entrevista con el acusado, como a la una menos cuarto del medio día; que éste estaba almorzando y el testigo fue donde él, y le dijo: "tú eres un hombre bueno y quizás no eres tan culpable como el que te mandó a matar; ¿porqué no acusas a la segunda persona? Me dijo: [Acusado] 'Yo no lo acuso porque si salgo mal de este caso al que voy a matar es a Rafael Molina' [Testigo] Yo le dije: tú te dejaste envolver . . . Yo le dije: ¿porqué tú te dejaste envolver? Acusa a Rafael Molina Cosme que fue la segunda persona. Me dijo: [Acusado] 'no lo voy a

---

(11) Este era el esposo de la testigo Adelina Vega; y tío carnal de la occisa Margarita Ortíz Rosario.

acusar porque lo voy a matar.' [Testigo] Yo le dije: no debe hacer eso. Me dijo [Acusado] 'Yo lo voy a matar.' "

El interrogatorio del fiscal a ese testigo Clemente Otero Ortíz continuó así:

"P. ¿Le dijo porqué?

R. Porque él es culpable de que se vea envuelto en el caso.

P. Le explicó porqué?

R. El me dijo que él era el culpable porque le habían dado un dinero. Yo le dije: tú debes acusarlo a él y hacerlo culpable y me dijo: 'no'.

P. El le dijo a Ud. que le habían dado dinero?

R. Si señor.

P. ¿Ud. le explicó a él . . . .

R. Le expliqué.

P. . . . antes de eso quien era Ud.?

R. Yo le dije que era esposo de Adelina y tío de la que murió."

Según se expresa en la opinión de ese caso, la declaración del testigo Otero Ortíz continuó al efecto de que esa conversación había ocurrido en un bar de Bayamón a la hora del almuerzo durante el receso del mediodía del primer día del juicio; que hablaron en forma pacífica sin faltarse el respeto; que no hubo discusión; el acusado no estaba borracho; que el acusado no le manifestó que en ese momento se encontrara enfermo; que allí no había policías, que él no le pagó al acusado ni le obligó a decir eso; que no le ofreció dinero a cambio, ni nada; no lo amenazó ni lo coaccionó; que el acusado estaba en la mesa almorzando en compañía de otras personas y el testigo lo llamó aparte y hablaron. En el contra-interrogatorio de este testigo surgió el hecho de que esa segunda persona, Rafael Molina Cosme y el testigo eran enemigos por cuestión de un pleito sobre un terreno.

El acusado no declaró. Dos testigos que declararon en su defensa, sostuvieron que en la tarde en que ocurrieron los hechos el acusado se encontraba con otras personas en la playa de Bajura, de Aguadilla. Esos dos testigos dijeron además que acompañaban al acusado el primer día del juicio

mientras almorzaba y negaron que persona alguna lo hubiera llamado aparte para hablar. El jurado rindió un veredicto de asesinato en primer grado.

Uno de los errores señalados giró en torno a esa declaración del testigo Clemente Otero Ortíz, que la Sala sentenciadora admitió como una confesión, y a las instrucciones dadas al jurado sobre esa declaración. En esas instrucciones la Sala se expresó así: ([12])

"En este caso, damas y caballeros del jurado, a través del testimonio del testigo Clemente Otero Ortíz se trajo a la consideración de Uds. y Uds. oyeron una alegada declaración hecha por el acusado a ese testigo donde el acusado admite haber cometido los hechos que se le imputan a base de dinero que le pagó un tal Rafael Molina Cosme. Para que una confesión pueda ser utilizada en contra de un acusado, para que pueda ser considerada por las damas y caballeros del jurado, éstos tienen que quedar convencidos más allá de duda razonable de que la tal confesión del delito es una confesión voluntaria. En este caso la confesión de que se trata, hecha por el acusado, lo fue a una persona particular. Quiero decirles a Uds. que aún en este caso en que la confesión fue dicha a una persona particular y no a ningún agente del gobierno o del Estado, Uds. deben quedar convencidos más allá de duda razonable de que la confesión que por la declaración de Clemente Otero Ortíz dice que el acusado le dijo, es una confesión voluntaria. Hasta que no queden convencidos de eso no pueden tomarla en consideración en forma que pueda afectar el resultado de este proceso porque si Uds., después de analizar las circunstancias concurrentes, entendieran que la declaración o la confesión no es el producto de la voluntad, del deseo, de la libre y espontánea voluntad del acusado, Uds. vienen obligados a rechazar esa confesión y resolver este caso y rendir el veredicto, cualquiera que fuera, por lo que Uds. determinen y concluyan del resto de la prueba ofrecida."

Resolviendo sobre los errores alegados, este Tribunal decidió en dicho caso de *Crespo Guerrero*, supra:

([12]) Véase dicho caso de *Crespo Guerrero*, supra, cita específica a la pág. 224.

"Como surge del récord, ante hechos conjeturados por el propio testigo Clemente Otero Ortíz en cuanto a la intervención o culpabilidad de un tercero en el crimen, y ante su insistencia de que el apelante acusara a este tercero, el acusado manifestó que si salía mal del caso mataría a esa persona. En dos ocasiones más se ratificó en que no la acusaría, sino que la mataría. Cuando se le pregunta al testigo la explicación del acusado para manifestar que mataría a esa tercera persona, el testigo vierte en sus palabras la explicación: 'Porque él es culpable de que se vea envuelto en el caso.' Al pedírsele de nuevo que explicara el por qué, el testigo contesta que el acusado le había dicho que él era el culpable porque le habían dado un dinero.

A tenor de ese récord, hay que convenir con el apelante en que se cometió un grave error por la Sala sentenciadora al instruir al jurado que a través de esa declaración el acusado admitió el haber cometido los hechos que se le imputaban, a base de dinero que le pagó Molina Cosme. En primer lugar, eso no era rigurosamente exacto según lo dicho por el testigo. En segundo lugar, y aunque incuestionablemente la declaración de Otero Ortíz contiene manifestaciones del acusado en relación con el crimen admisibles en su contra, era al jurado a quien correspondía hacer cuantas deducciones e inferencias fueran permisibles de las expresiones del acusado; era al jurado a quien correspondía pesar y justipreciar este testimonio tomándolo en conjunto, a la luz de los hechos que sirvieron de fondo para esas expresiones; inclusive, era al jurado a quien correspondía interpretar y darle sentido, tomando en cuenta todos los ingredientes de la declaración, a lo que el testigo quiso decir, y a quien se refería el acusado, en la última parte de la declaración mientras trataba de explicar el porqué de la actitud del acusado en cuanto a esa tercera persona. Al decirle la Sala sentenciadora al jurado que a través de la declaración de este testigo el acusado admitió los hechos que se le imputaban—la comisión de un delito de asesinato en primer grado—a base de paga que recibió de Rafael Molina, expresión esta última que no aparece así del récord, el Juez le trasmitió al jurado un hecho producto de su propia justipreciación de esa prueba y producto de su propia conclusión sobre este testimonio. Eso le está vedado al Juez.

La Sala sentenciadora también cometió error, ahora como cuestión de derecho, al adjetivar en sus instrucciones el testimonio de Clemente Otero Ortíz como una confesión del acusado.

A la luz de las normas aceptadas en derecho que distinguen una confesión de aquellas otras expresiones de un acusado, eslabones de prueba que conducen a su culpabilidad, y que por ello son permisibles en evidencia como admisiones, este testimonio no contiene una confesión del delito imputado. Consúltense: *Pueblo* v. *Casanova,* 77 D.P.R. 729 (1954), pág. 733; *Pueblo* v. *Rivera,* 71 D.P.R. 124 (1950), pág. 129; *Pueblo* v. *Sánchez,* 55 D.P.R. 351 (1939), pág. 371 y casos citados; *Edwards* v. *State,* (Ga.) 100 S.E.2d 172, págs. 174–175; *Johnson* v. *State,* (Ga.) 50 S.E.2d 334, pág. 335; *People* v. *Miller,* (Ill.) 87 N.E.2d 649, pág. 652.

Instruir al jurado, en cualquier caso, que un testimonio es una confesión del acusado, que en derecho significa que ha admitido o reconocido de manera absoluta los hechos y elementos esenciales del delito que se le imputa, sin que en ley sea una confesión, constituye un grave error de derecho que amerita la revocación de la sentencia. *Edwards* v. *State; Johnson* v. *State; People* v. *Miller,* supra; *Harris* v. *State,* 61 S.E.2d 135, pág. 137; *McCloud* v. *State,* 143 S.E. 558, pág. 560. Maguire, *Evidence of Guilt,* (1959), pág. 117.

Una vez que el Juez instruyó al jurado que la declaración de Otero constituía una confesión del apelante, les transmitió la noción y su criterio de que éste aceptaba el haber cometido los hechos imputados en la acusación, cosa ésta perjudicial, particularmente en cuanto a la determinación de si el acusado cometió un asesinato de primer grado o uno de segundo grado en vista de la única otra evidencia sobre los hechos. Sólo quedaba al jurado pasar sobre el factor de credibilidad del testigo y de la voluntariedad de la llamada confesión, hecho éste que no presentaba controversia. El testimonio de Clemente Otero Ortíz debió haber sido considerado por el jurado libre de todo comentario, conclusión, adjetivación o criterio de parte del Juez, debiendo ese cuerpo como único juzgador de los hechos justipreciar dicho testimonio y derivar del mismo las inferencias y conclusiones apropiadas. Consúltense: *Pueblo* v. *Sanjurjo,* 73 D.P.R. 574 (1952); *Pueblo* v. *Bartolomei,* 70 D.P.R. 698 (1949).

Este segundo error incurrido en las instrucciones es de tal naturaleza perjudicial que requiere la concesión de un nuevo juicio y se dictará sentencia a tal efecto." (Págs. 225–227.)

Nos hemos extendido en el comentario de dicho caso de *Crespo Guerrero,* supra, para que se vea claramente que los

hechos ocurridos en el mismo son enteramente distintos a los del presente, y que la doctrina establecida en el mismo no es aplicable a los hechos envueltos en este caso. En éste, el acusado se sentó voluntariamente a declarar en su propia defensa. Ante el jurado admitió abiertamente que había dado muerte a su joven esposa al encontrarla en su cama con otro hombre, lo cual lo puso furioso, ". . . *se me cegaron los ojos . . . .*" "*Como se había subido la sangre a la cabeza volví directamente al cuarto, comencé a darle tiros a mi esposa y de ahí no recuerdo más.*" (Bastardillas nuestras.)

Es más, como bien apunta la Hon. Procuradora General en su alegato, la teoría de la defensa ". . . estuvo precisamente predicada en la admisión de hechos constitutivos de un delito de homicidio voluntario." La representación legal del acusado apelante al dirigirse al tribunal y a los miembros del jurado para exponer la teoría de su caso, al finalizar se expresó así:

". . . La defensa *no puede tapar el cielo con la mano, no puede negar que esta persona dió muerte a la perjudicada. Después de probar todo esto vamos a pedirle a ustedes que traigan un veredicto de homicidio voluntario.*" (T.E., pág. 167.) (Bastardillas nuestras.)

". . . el jurado creyó la versión del acusado-apelante y lo complació. No vemos, pues, de que puede quejarse.", como bien expone la Hon. Procuradora General. Y añadimos nosotros: El jurado fue bien generoso con el apelante.

■ Nótese que lo que esencialmente constituiría un error grave de derecho sería dar una instrucción que cualifique o designe como *confesión* un testimonio sin que en ley lo sea. *Cf. Pueblo* v. *Pacheco Padilla*, 92 D.P.R. 894 (Dávila) (1965). El Código Penal define el homicidio voluntario como el acto de dar muerte ilegal a un ser humano sin que medie malicia cuando dicha muerte ocurre en ocasión de una súbita pendencia o arrebato de cólera.

■ Convenimos con la Hon. Procuradora General en que:

"Basta una ligera lectura del testimonio que prestó el acusado-apelante en la silla testifical (T.E.págs. 171–193, 205–212) para llevarnos al pleno convencimiento de que en el mismo se admiten los hechos y elementos esenciales de un delito de homicidio voluntario, lo cual en derecho participa propiamente de la naturaleza de una confesión judicial. En síntesis, de acuerdo con su propia declaración, él mató a su esposa cuando en un momento de coraje se 'le subió la sangre a los ojos' y comenzó a dispararle cuando la sorprendió con otro hombre en la cama de su dormitorio en su propio hogar. Esto, repetimos, no es otra cosa que la clara confesión de un delito de homicidio voluntario conforme a su definición en nuestro Código Penal."

En cuanto al segundo error que se alega cometió el tribunal de instancia, consideramos que el mismo también carece de méritos. Se alega que dicho tribunal incidió al instruir al jurado contrario a lo dispuesto en *Pueblo* v. *Natal Rojas*, supra.

El juez de instancia dió al jurado las siguientes instrucciones (T.E. pág. 247) :

"Por un precepto expreso de la ley, el acusado puede o no declarar, según él así lo desee. En este caso el acusado ocupó la silla de los testigos, prestó testimonio, testificó, por lo tanto, su testimonio debe tomarse en consideración como el de cualquier otro testigo, tendiendo, [*sic*] desde luego, en cuenta el interés que todo acusado tiene en su propia causa."

En la opinión *Per Curiam* emitida en dicho caso de *Natal Rojas*, supra, el juez dió al jurado una instrucción parecida a la anterior, al efecto de que la declaración del acusado debe tomarse en consideración como la de cualquier otro testigo, *teniendo en cuenta, por supuesto, el interés que todo acusado tiene en su propio caso.*

■ Refiriéndose a la cualificación que así se hizo de la declaración del acusado expresamos:

"Aunque aprobamos instrucciones como ésta en *Pueblo* v. *Febres Córdova,* Per Curiam, resuelto en 15 de junio de 1964,

444

y en *Pueblo* v. *Morales González*, 39 D.P.R. 30, 36–37 (1929), hemos concluido que no es juicioso que en lo sucesivo se continúe la práctica de así instruir al jurado ya que no es propio ni necesario cualificar así el testimonio del acusado. Constituye una justicia más sana el dejar al juicio del jurado el peso que deba darle a ese testimonio. Esta norma estará disponible solamente para personas cuyos juicios empiecen después de la fecha de esta sentencia." *Natal Rojas*, supra, pág. 844.

No obstante, dadas las circunstancias de ese caso, no consideramos que la instrucción objetada fuera de tal naturaleza perjudicial que diera lugar a la revocación de la sentencia dictada por el Tribunal Superior, Sala de Arecibo, y confirmamos la misma.

Igual situación surge en el caso de autos. Hemos examinado detenidamente todas las circunstancias que surgen de todo el expediente de este caso, incluyendo la voluminosa transcripción de evidencia y los alegatos de las partes, y no encontramos absolutamente nada que nos indique que la instrucción objetante fuera perjudicial en nada al apelante. Por el contrario, éste fue acusado de asesinato en segundo grado, y el veredicto del jurado le fue favorable, ya que fue por un delito menor del que se le imputaba, el de homicidio voluntario, que fue precisamente el que el acusado solicitó del jurado que trajera, al exponer la defensa su teoría del caso, como hemos apuntado arriba; y el que él, con su propia declaración, admitió haber cometido, al expresar que la mató en un arrebato de cólera.

■ Finalmente, el apelante, en su "Señalamiento Especial" formulado, al efecto de que la pena impuéstale no es proporcional al delito cometido, nos pide que la modifiquemos, dentro de nuestra discreción, rebajándola. Nada aporta el apelante que justifique nuestra intervención con la decisión del ilustrado Juez Sentenciador al imponer la pena en la forma que lo hizo, excepto en cuanto a la imposición de 8 meses de cárcel por la infracción al Art. 6 de la Ley de

Armas (25 L.P.R.A. sec. 418), que por ser un delito menos grave procede que se reduzca a 6 meses de cárcel.

Por las razones expuestas *se dictará sentencia confirmando la dictada en este caso por el Tribunal Superior de Puerto Rico, Sala de San Juan, con fecha 27 de mayo de 1970 en el caso criminal G-69-1606, donde se le condenó a cumplir de 6 a 10 años de presidio por homicidio voluntario y se enmienda, la condena por el Art. 6 de la Ley de Armas, reduciéndola de 8 meses a 6 meses de cárcel, a cumplirse ambas penas consecutivamente, y así modificada, se confirma.*

—O—

Yo, Angel G. Hermida, Secretario General del Tribunal Supremo de Puerto Rico, por la presente CERTIFICO:

Que la opinión que antecede, según emitida por el Juez Asociado Señor Cadilla Ginorio, fue aprobada y adoptada por el Tribunal en vida del Juez Cadilla. Sin embargo, por estar circulando una opinión concurrente del Juez Irizarry Yunqué, el Juez Cadilla no había firmado de su puño y letra el original de su opinión (aunque sí había firmado la hoja de circulación) interviniendo antes su súbito fallecimiento.

Y para que así conste, firmo la presente y estampo en ella el sello del Tribunal Supremo, en San Juan de Puerto Rico, hoy día 24 de febrero de 1975.

(Fdo.) Angel G. Hermida

*Secretario General*

El Juez Asociado, Señor Irizarry Yunqué, concurre en una opinión en la cual concurren también el Juez Presidente, Señor Trías Monge, y los Jueces Asociados, Señores Martín y Negrón García.

—O—

Opinión concurrente del Juez Asociado Señor Irizarry Yunqué con la cual concurren el Juez Presidente Señor Trías Monge y los Jueces Asociados Señores Martín y Negrón García.

San Juan, Puerto Rico, a 24 de febrero de 1975

A mi juicio, bajo ninguna circunstancia debe un juez, al instruir al jurado, calificar la declaración o el testimonio del acusado como una confesión. Acepto que lo declarado por el apelante es compatible con el fallo de homicidio voluntario, pero en el descargo de su obligación de aquilatar la prueba en su justo valor, el jurado puede siempre fijarse en sutilezas y hacer conjeturas que le conduzcan a concluir que el acusado no es responsable criminalmente. En este caso en particular, bien podía el jurado entender, en el ejercicio de su libérrima voluntad y de su exclusivo derecho de evaluar el testimonio del apelante, que el espectáculo que presenció de la infidelidad de su esposa, un mes después de casada con él, le produjo tal turbación emocional que le privó de sus sentidos. En el delito de homicidio voluntario la responsabilidad criminal está predicada en la intención de matar. El testimonio del apelante, repito, sirve de base para concluir que hubo esa intención. También podía servir de base al jurado para concluir que no la hubo. Téngase presente estas palabras del apelante: "Como se había subido la sangre a la cabeza volví directamente al cuarto, comencé a darle tiros a mi esposa y *de ahí no me recuerdo más.*" (Énfasis suplido.)

La confesión, a diferencia de la admisión, es la aceptación de todos los hechos esenciales para que se sostenga la comisión de un delito, incluyendo el importantísimo elemento subjetivo de la intención criminal. *Pueblo* v. *Meléndez Santiago,* 93 D.P.R. 770 (1966); *Pueblo* v. *Guido Maya,* 90 D.P.R. 821 (1964); *Pueblo* v. *Crespo Guerrero,* 90 D.P.R. 217 (1964).

El juez le dijo al jurado que la declaración del acusado "constituye una confesión del delito de homicidio voluntario." Esa expresión constituye una indebida intromisión en la facultad exclusiva del jurado de ser juzgador de los hechos. Toda vez que se juzgaba al apelante bajo acusación de asesinato en primer grado, la instrucción de que el jurado no tenía que creer la versión dada por el acusado resultaba un mero paliativo, y podía llevar al jurado a concluir, o que el acusado mintió y que era falsa su versión y era por tanto culpable de asesinato, o que era culpable de homicidio voluntario en vista de que, su versión, había que tomarla como una confesión de ese delito. La alternativa de un veredicto absolutorio dada por el juez en sus instrucciones no tenía otro alcance, bajo las circunstancias, que el de una mera formalidad.

La distinción que la opinión de la mayoría hace de *Pueblo* v. *Crespo Guerrero*, 90 D.P.R. 217 (1964), es sutil. No podemos ir contra las claras expresiones de ese caso, página 225, que aquí parafraseamos: ". . era al jurado a quien correspondía hacer cuantas deducciones e inferencias fueran permisibles de las expresiones del acusado; era al jurado a quien correspondía pesar y justipreciar este testimonio tomándolo en conjunto, a la luz de los hechos que sirvieron de fondo para esas expresiones; inclusive, era al jurado a quien correspondía interpretar y darle sentido, tomando en cuenta todos los ingredientes [*sic*] de la declaración . . . ."

No obstante, concurro en que la sentencia debe confirmarse. El jurado rindió el veredicto que el apelante expresamente le solicitó por mediación del informe preliminar de su abogado, cuyas expresiones le obligan. *Barletta* v. *Tribunal Superior*, 99 D.P.R. 379 (1970); *Pueblo* v. *Santiago*, 78 D.P.R. 69 (1955); *Pueblo* v. *Vargas*, 74 D.P.R. 144 (1952). Al exponer su teoría, el abogado defensor expresó:

". . La defensa no puede tapar el cielo con la mano, no puede negar que esta persona dió muerte a la perjudicada. Después de probar todo esto vamos a pedirle a ustedes que traigan un vere-

448

dicto de homicidio voluntario." (T.E. pág. 167.) (Bastardillas nuestras.)

De no ser por esas expresiones, habiendo hecho el apelante alegación de no culpable, la instrucción calificando su testimonio como una confesión del delito de homicidio voluntario le hubiese sido tan perjudicial que a mi juicio hubiese ameritado la revocación del fallo. Siendo la declaración del acusado en este caso compatible con la teoría expuesta por su abogado, la errónea instrucción sobre la calificación de su testimonio en nada le perjudicó.