# 97 DTA 124

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL IV DE AGUADILLA Y MAYAGUEZ**

EL PUEBLO DE PUERTO RICO
Apelado

v.

PERFECTO DESARDEN VALENTIN
Apelante

Núm. KLAN-95-00520

San Juan, Puerto Rico, a 5 de junio de 1997

Panel integrado por su Presidente, el Juez Brau Ramírez,
el Juez Colón Birriel y la Juez Feliciano de Bonilla

Colón Birriel, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

### I

El apelante Perfecto Desardén Valentín (*"Desardén"*) fue acusado ante el entonces Tribunal Superior, Sala de Mayaguez, el 9 de mayo de 1994 por cinco (5) cargos de violación, tres (3) en su modalidad técnica y dos (2) en su modalidad de violencia e intimidación, Arts. 99 (a) y (c) del Código Penal, 33 L.P.R.A. sec. 4061 (a) y (c) (Supl. 1994), respectivamente, y por infracciones a los Arts. 6 y 8 de la Ley de Armas, 24 L.P.R.A. secs. 416 y 418 (Supl. 1994), respectivamente.

Luego de los procedimientos posteriores y tras celebrado el juicio por jurado, el 10 de marzo de 1995, el jurado rindió veredictos que el tribunal interpretó como absolutorios en todos los cargos, procediendo entonces a pronunciar su fallo de conformidad.

Posteriormente, el 29 de marzo de 1995, esto es, diecinueve (19) días después, uno de los miembros del jurado que participó en el proceso, tras concluir su participación en otro juicio por jurado, solicitó al juez que presidió el juicio de Desardén --Hon. Luis Rivera Román-- verlo en su oficina. Tras acceder el juez Rivera Román a lo solicitado, el jurado le informó que había concluido sus tres (3) meses de servicio en el panel y quería ser excusado. Acto seguido le informó que otra persona del panel de jurado que presidió en el juicio de Desardén, le expresó sorpresa de lo publicado por la prensa --en el periódico El Vocero--, a los efectos de que Desardén había salido absuelto en todos los cargos, a pesar de que él como miembro del jurado que deliberó en los casos, sabía que el jurado había absuelto a Desardén en seis (6) cargos, (cuatro (4) de violación y dos (2) por Ley de Armas) y lo había encontrado culpable en uno (1) de los cargos de violación técnica. El Juez Rivera Román le informó al jurado, que según su mejor recuerdo del examen y lectura de los veredictos, era que a Desardén se le había absuelto de todos los cargos, pero que por la importancia de lo informado lo investigaría.

Al día siguiente, en horas de la mañana, el Juez Rivera Román se reunió en privado con el Fiscal Jaime L. Zambrana Grana, quien representó en el proceso al Ministerio Fiscal, y con el Lcdo. Nelson Gómez Couret, quien representó a Desardén.

Este les comunicó la información recibida del jurado y que esa misma tarde conduciría una investigación con los miembros del jurado que participaron en el caso, con el fin de conocer la veracidad de la información recibida en cuanto a los veredictos rendidos por éstos. El tribunal procedió a realizar la investigación, la que consistió de entrevistas individuales y bajo juramento a cada miembro del panel del jurado. Antes de comenzar las entrevistas, se discutió con el Ministerio Fiscal y la representación legal de Desardén, sobre el ámbito de las preguntas. Estos no tuvieron reparos en cuanto al procedimiento a seguir. Dichas preguntas fueron dirigidas a indagar si los miembros del jurado se acordaban del proceso de deliberación y cuál fue el veredicto del panel de jurado en los casos.

Las preguntas fueron enmarcadas dentro del siguiente contexto: 1. ¿Recuerda su participación como jurado en los casos del señor Perfecto Desardén?; 2. ¿Cuántos casos tuvo el jurado ante su consideración?; 3. ¿En todos los casos hubo veredicto?; 4. ¿Recuerda cuál fue el veredicto?; 5. ¿En todos los casos de armas fue el mismo veredicto?; ó. ¿En todos lo casos de violación fue el mismo veredicto?; 7. De responderse que alguno de los veredictos fue de culpabilidad, se preguntaría para identificar en cual de ellos.

Luego de concluido el procedimiento anterior se confirmó por el tribunal que, efectivamente, uno de los veredictos del jurado en uno de los cargos por violación técnica, Criminal Núm. HO-94-G-0079, había sido de culpabilidad. Aparentemente, lo ocurrido obedeció a que el presidente del jurado, por inadvertencia, primero escribió *"no culpable"* en la boleta del veredicto; al percatarse del error, tachó la palabra *"no"* y puso sus iniciales, las cuales, desafortunadamente, también parecían deletrear la palabra *"no"*. Tanto el tribunal como la secretaria de sala interpretaron ese veredicto como absolutorio. El jurado, por haber sido excusado de sala luego de que el tribunal aceptara el veredicto, pero antes de que la secretaria lo leyera en alta voz, no tuvo la oportunidad de inmediatamente llamarle la atención al tribunal en cuanto al referido error. ■ Acto seguido, el tribunal mediante

fundamentada resolución de fecha 12 de mayo de 1995, dejó sin efecto su fallo absolutorio en el caso HO-94-G-0079. Entendió dicho foro que el veredicto del jurado en ese caso en particular, no correspondía a la verdadera voluntad e intención de éste, por lo que procedió a aceptar y dar vigencia al veredicto de culpabilidad emitido por el jurado emitiendo, de este modo, un fallo de culpabilidad en el caso HO-94-G-0079, por el delito de violación técnica.

Luego de otros incidentes, incluyendo una moción presentada por el Ministerio Fiscal para que se dictara sentencia con agravantes, el tribunal pronunció su sentencia condenando a Desardén a cumplir quince (15) años de prisión.

Inconforme con dicha sentencia, el 22 de mayo de 1995 Desardén recurre ante nos mediante el presente recurso de apelación, imputándole al foro de instancia el haber incurrido en los siguientes errores: ■

*"A) Erró el jurado al declarar culpable al apelante cuando la prueba de cargo resultó insuficiente en derecho para establecer su culpabilidad más allá de duda razonable.*

*B) Erró el Honorable Tribunal de Instancia al dejar sin efecto un veredicto de no culpable, que ya había aceptado, leído y en virtud del cual había absuelto al apelante, para luego aceptar otro veredicto de culpabilidad, y declarar culpable y convicto al apelante, luego de reunir al panel de jurados previamente excusado."*

Entendemos prudente comenzar nuestro análisis de las cuestiones planteadas con la discusión del segundo señalamiento de error -Error (B)-, ya que de haberse cometido el mismo, ello haría improcedente la discusión del primer señalamiento de error -Error (A)-.

En su señalamiento de error (B), alega Desardén que incidió el foro de instancia *"al dejar sin efecto un veredicto de no culpable, que ya había aceptado, leído y en virtud del cual [lo] había absuelto, para luego aceptar otro veredicto de culpabilidad, y declarar[lo] culpable y convicto..., luego de reunir al panel de jurado, previamente excusado"*. Específicamente, y en primer lugar, alega que toda vez que habían transcurrido diecinueve (19) días desde que los miembros del panel de jurados habían sido excusados, el foro de instancia claramente había perdido el control sobre éstos y, por tanto, no procedía el que los reuniera para corregir el error señalado posteriormente. Esto es, alega que ya no eran realmente el jurado sino doce (12) ciudadanos individuales, a los cuales se les había relevado de sus funciones con respecto al caso, de su obligación de no discutir con nadie lo relativo al mismo, expuestos al mundo exterior y en absoluta libertad para hablar con terceras personas sobre el proceso. En apoyo de lo anterior cita los casos de *Pueblo v. Hernández Olmo,* 105 D.P.R. 237, 241 (1976); *People v. Thornton,* 202 Cal. Rptr 448 Cal App. 2 Dist. 1984); *People v. Lee Yune Chong,* 94 Cal. 379 (1R99) y *People v. Romero,* 31 Cal 3d. 385 (1982), entre otros. No le asiste la razón. Veamos por qué.

Se ha definido el veredicto como *"el concenso del jurado respecto a la inocencia o culpabilidad del acusado".* El mismo deberá ser presentado por escrito por el Presidente del Jurado, y constituirá la expresión libre y verdadera de la opinión de los miembros del jurado. Dora Nevarez-Muñiz, *Sumario de Derecho Procesal Puertorriqueño,* Hato Rey, Instituto para el Desarrollo del Derecho, 3ra ed., 1989, pág. 149.

Por su parte, en cuanto al particular, la Regla 145 de las Reglas de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 145, dispone lo siguiente:

*"Después que el jurado se hubiere puesto de acuerdo sobre el veredicto, regresará a la sala de sesiones bajo la custodia del alguacil, y el presidente de dicho jurado entregará el veredicto por escrito al secretario de la sala para que éste lo entregue al tribunal.* ***El tribunal preguntará al presidente del jurado si dicho veredicto es el veredicto del jurado y cuántos jurados votaron en favor del mismo.*** *Si el presidente del jurado respondiere en la afirmativa, y el veredicto rendido fuere conforme a la ley, el mismo será aceptado por el tribunal y leído por el secretario."* (Enfasis nuestro).

En el ámbito federal se ha explicado la diferencia entre el veredicto que trae el jurado en un sobre sellado y el veredicto final del jurado el cual es leído en corte abierta y es aceptado por el juez, de la

181

siguiente manera:

*"The jury's verdict is that which the jury announces to the court, in open court, and is received and recorded as the jury's finding. A sealed verdict is an agreement in writing reached by the jurors, and does not become the jury's verdict until, as just stated, it is announced and received by the court".* 5A Moore, *Federal Practice,* 2da ed., 1977, sec. 49.07, pág. 2237.

En nuestra jurisdicción existen varios posibles veredictos. El veredicto del jurado puede declarar al acusado, con respecto al delito imputado en el pliego acusatorio, *"culpable", "no culpable"* o *"no culpable por razón de locura".* No será necesario conformarlo estrictamente a esta terminología, **pero la intención del jurado deberá constar claramente.** Regla 146 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 146. Véanse, además, a estos efectos, *Pueblo v. Martínez Díaz,* 80 D.P.R. 467 (1964) y *Pueblo v. Arroyo Ramírez,* 96 D.P.R. 576 (1968), donde nuestro Tribunal Supremo expreso: *"[e]n esencia, lo importante es determinar cuál ha sido la verdadera intención del jurado".* (Énfasis nuestro).

Ahora, en lo pertinente al caso que nos ocupa, nuestro Tribunal Supremo ha expresado que un juez antes de que el veredicto sea aceptado, puede ordenar al jurado que reconsidere un veredicto erróneo producto de una equivocación del jurado al aplicar la ley, Regla 148 de las de Procedimiento Criminal, ██ o un veredicto defectuoso que no permita entender con razonable claridad la decisión del jurado respecto a culpar o absolver al acusado, Regla 149 de las de Procedimiento Criminal. ██ Ahora, ambas reglas colocan dicha orden para ulterior deliberación antes de que el veredicto sea aceptado. Esto es, dichas reglas contemplan la posibilidad y de hecho proveen un mecanismo para alterar y rectificar un veredicto antes de que el mismo sea aceptado por el tribunal.

Por otro lado, ha expresado además, que sólo un tribunal apelativo tiene facultad para anular un veredicto aceptado por el juez, revocar el fallo y reinstalar otro en su lugar. *Pueblo v. Alvarado,* 49 D.P.R. 423 (1936). A estos efectos, nos explica que la actuación de un juez al recibir un veredicto, cuando luego procede a enterarse del mismo, lo pasa a la secretaria de sala para su lectura y dicta fallo condenatorio o absolutorio, crea un estado de derecho irreversible, porque de ese modo termina el juicio. Es decir, una vez se acepta el veredicto, esta aceptación constituye el *"punto final a la intervención del jurado en el proceso, y cierre de la función deliberativa".* (Énfasis nuestro). *Pueblo v. Hernández Olmo, supra; Pueblo v. Sabater Mangual,* 95 D.P.R. 597, 601 (1967). Se concreta con esa aceptación del veredicto la exposición del acusado a castigo, y excluye ulterior riesgo. Art. II, Sec. 11, Constitución del Estado Libre Asociado.

Particularmente, en *Pueblo v. Hernández Olmo, supra,* el juez de instancia aceptó un veredicto de culpabilidad por el delito de homicidio involuntario, delito menor incluido dentro del delito imputado de imprudencia crasa o temeraria al conducir un vehículo de motor, Artículos 86 y 87, 33 L.P.R.A. secs. 4005 y 4006. Luego de pasar el veredicto a la secretaria de sala para su lectura, el juez dictó fallo declarando al acusado culpable y convicto de homicidio involuntario. Al percatarse que había cometido un error por razón de haber denegado dar al jurado las instrucciones del delito subsumido solicitadas por la defensa, envió al jurado a deliberar nuevamente y se produjo un segundo veredicto por el delito de imprudencia crasa, Art. 87 del Código Penal. El juez aceptó también este segundo veredicto y procedió a dictar nuevo fallo de convicción. Ante un recurso de *certiorari* presentado por el acusado, nuestro Tribunal Supremo revocó al resolver que un juez crea un estado de derecho irreversible en un caso criminal cuando recibe un veredicto, se entera de su contenido, lo pasa a la secretaria de sala para su lectura y dicta fallo de convicción, terminando el magistrado de esa manera el juicio; que siendo ello así, era nulo el segundo veredicto contra el acusado por infracción al Art. 87 del Código Penal cuando el jurado había dictado un primer veredicto de culpabilidad contra dicho acusado por el delito de homicidio involuntario y dicho primer veredicto había sido aceptado por el juez.

Ahora bien, en el presente caso, y lo que lo distingue de todas las situaciones antes mencionadas y contempladas por las Reglas de Procedimiento Criminal antes señaladas, en particular por la Regla 146 de dicho cuerpo de reglas, *supra,* **es que en el mismo no se trata de un veredicto erróneo sino de un veredicto emitido correctamente interpretado erróneamente, razón por la cual no se trata de un caso donde tuviera que haber ulterior deliberación, es decir, nos encontramos ante un**

**error de forma** *("clerical error")* **que no requería ulterior deliberación por parte del jurado, sino una simple aclaración.**

En cuanto a errores de forma en el veredicto y la potestad de un tribunal para subsanar los mismos luego de disuelto el jurado, no existe jurisprudencia de nuestro Tribunal Supremo que arroje luz sobre el particular. No obstante, en varias jurisdicciones de los Estados Unidos en que han ocurrido situaciones similares los distintos foros se han expresado en cuanto al particular y como veremos existe cierta consistencia entre los referidos dictámenes, a los efectos de que lo **importante es determinar la verdadera intención del jurado en cuanto a absolver o condenar al acusado.** Veamos.

En *Commonwealth v. Dzvonick, Pa.,* 297 A.2d 912, Nota al calce Núm. 4, 914-915 (1972), el Tribunal Supremo de Pennsylvania expresó:

*"The situations in which molding is permissible are severely circumscribed. They fall into two principal categories-molding prior to recording the verdict and discharge of the jury, and molding after such recording and discharge.*

*Prior to recording the verdict there are two accepted methods of verdict molding. See Laub, Pennsylvania Trial Guide, sec. 244, at 416 (1959). If the jury's error is defective in form only, as here where the date was omitted, then the judge may correct it in open court with the acquiescence of the jury. (Citas omitidas). However, if the error is substantive, the court must send the jury back with additional instructions for further deliberation. (Citas omitidas).*

*After verdict has been recorded and jury discharged, only in **"extremely exceptional cases"** may the verdict be molded and even then "only unless to make the corrected verdict conform to the obvious intention of the jury, i.e., to conform to a verdict actually rendered, but informally or improperly stated in writing. Laub, supra, at 415."* (Enfasis nuestro).

En *Commonwealth v. Homeyer,* 94 A.2d 743 (1953), se permitió la corrección de un veredicto aceptado por el Tribunal debido a que el veredicto correcto era claro e incuestionable; esto es, no existía duda en cuanto a cuál era el veredicto correcto. De igual forma resolvió el Tribunal en *Commonwealth v. Huett, Pa.,* 341 A.2d 122, 124 (1975), donde se expresó, lo siguiente:

*"...before the recorded verdict may be altered or amended, **there must be a finding, and sufficient evidence to support that finding, that the recorded verdict did not reflect the obvious intention of the trier of facts."*** (Enfasis nuestro). ■

En adición, en cuanto a la posibilidad de poder reconstituir el panel de jurado luego de disuelto y aceptado el veredicto, se ha resuelto que cuando se trata de errores de forma o manifiestos *("obvious errors")* se puede reconstituir dicho panel de jurados para corregir tales errores. A estos efectos véase Anotación, *"CRIMINAL LAW: PROPRIETY OF REASSEMBLING JURY TO AMEND, CORRECT, CLARIFY, OR OTHERWISE CHANGE VERDICT AFTER JURY HAS BEEN DISCHARGED, OR HAS REACHED OR SEALED ITS VERDICT AND SEPARATED."* 14 A.L.R.5th 89, sec. 10 a la pág. 137 (1993) y casos allí citados.

Lo ocurrido en el presente caso, sin lugar a dudas, es un ejemplo claro de lo que constituye un error de forma o manifiesto. Esto es, se trata de un veredicto correcto y emitido de acuerdo a la ley que por inadvertencia fue interpretado o, más bien, leído incorrectamente tanto por el juez que presidió la vista como por la secretaria de sala. La corrección de dicho veredicto no conllevó deliberación alguna, mucho menos ulterior análisis de la prueba desfilada.

Dicho jurado fue reconstituido, simple y sencillamente para corroborar si la interpretación había sido errónea. En este sentido, aunque ciertamente los jurados estuvieron diecinueve (19) días fuera del control de la corte, dicha exposición al mundo exterior poco efecto pudo haber tenido sobre la cuestión que se pretendía indagar; esto es, la verdadera intención y voluntad del jurado. Entendemos, además que el procedimiento adoptado por el tribunal fue suficiente en derecho y confiable para cerciorar, sin lugar a dudas, la verdadera intención del jurado y, por consiguiente, el verdadero

veredicto.

En conclusión, resolvemos que el Tribunal de Primera Instancia actuó de acuerdo a la ley y la justicia al corregir el veredicto de la forma en que lo hizo. Esto es, procedió a dar vigencia a la verdadera voluntad, intención y veredicto rendido por el jurado en el caso HO-94-G-0079. Resolver lo contrario equivaldría a un extravío de la justicia, además de que se vulneraría el propósito y razón de ser de la institución del jurado como Jueces de hechos. Es decir, se frustraría la verdadera intención del jurado, además, del proceso en sí.

En segundo lugar, para sostener el señalamiento de error que ahora nos ocupa, alega Perfecto Desardén que con su actuación el foro de instancia lo privó *"de su derecho a comprobar que el veredicto de culpabilidad en el caso HO-94-G-0079, ... no fue producto de la coacción"*. Es decir, alega, en esencia, que se le impidió hacer una encuesta *("polling")* del jurado conforme a lo establecido en la Regla 151 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 151.

La Regla 151, *supra*, dispone:

*"Cuando el jurado hubiere rendido un veredicto, a requerimiento de cualquier parte o a instancias del propio tribunal, tal veredicto deberá ser comprobado en cuanto a cada miembro del jurado. Si como resultado de esta comprobación se determinare que el veredicto no fue rendido, al menos, por nueve miembros del jurado, se le podrá ordenar al mismo retirarse a continuar sus deliberaciones o podrá ser disuelto. "*

La encuesta del jurado tiene su génesis en el derecho común; razón por la cual existe numerosa jurisprudencia estatal en cuanto a los propósitos de la misma. Así, pues, se ha resuelto que se justifica dicha investigación del voto individual de cada miembro del jurado, principalmente, para eliminar toda incertidumbre en cuanto al veredicto que se rinde, *State v. Brown*, 168 N.E.2d 419 (Ohio 1953); *State v. Cleveland*, 78 A.2D 560 (N.J. 1951), para brindar una oportunidad a cada uno de los miembros para expresar libremente su decisión sin los temores y presiones que puedan haber rodeado las deliberaciones privadas, *Commonwealth ex rel. Ryan v. Banmiller*, 162 A.2d 354 (Pa. 1960); *Solar v. United States*, 86 A.2d 538 (D.C. 1952); *Commonwealth v. Martin*, 109 A.2d 325 (Pa. 1954), y como medio para eliminar confusión y errores en los veredictos, especialmente en estados en donde el jurado puede hacer recomendaciones sobre la pena que deba imponerse en caso de convicción, *Bridges v. State*, 122 So. 533 (Miss 1929). Se ha justificado. además, como parte del requisito de unanimidad requerido para un veredicto, como un incidente del derecho concedido al acusado a estar presente cuando se rinde el veredicto, y como una garantía adicional para el acusado en aquellos casos en que se permiten veredictos firmados (sealed) por todos los miembros del jurado.

De igual forma se ha expresado nuestro Tribunal Supremo al disponer que:

*"El propósito de esta Regla es garantizarle al acusado que el veredicto anunciado es el verdadero acuerdo del jurado y que ninguno de los jurados ha sido coaccionado. **Es la oportunidad que tienen los jurados de protestar en corte abierta si el veredicto anunciado no responde a lo acordado.**"* (Énfasis nuestro.) *Pueblo v. Ruiz Torres*, 99 D.P.R. 830, 831-832 (1971).

Se aclaró, además, en el referido caso de Ruiz Torres, *supra*, que lo que garantiza al acusado dicha regla es comprobar única y exclusivamente que el veredicto anunciado es el verdadero acuerdo del jurado; es decir, no puede éste inquirir de cada jurado cómo fue que votó.

Ahora bien, existen tres prácticas o reglas distintas con referencia a la encuesta del jurado en un proceso criminal, una vez hecha la petición por el acusado, a saber : (1) que el acusado tiene derecho a la encuesta como cuestión de derecho; (2) que la concesión de tal solicitud es discrecional del tribunal; y (3) que no se permite realizar la encuesta. Anotación, *"Accused's Right to Poll of Jury"*, 49 A.L.R.2d, 621 (1956).

La regla que rige en la mayoría de los estados así como en Puerto Rico es a los efectos de que si el estatuto concede al acusado el derecho a solicitar la encuesta, una petición suya **oportunamente** presentada, no debe ser denegada. En estos estados en que el derecho se consagra por estatuto,

constituye un derecho sustancial, y la negativa a concederlo constituye un error que ocasiona la revocación. *Carver v. Commonwealth,* 256 S.w. 2d 375 (Ky. 1953). Igual regla predomina en la jurisdicción federal. ■ *Miranda v. United States,* 255 F.2d 9 (C.C.A.1. 1958); *Mackett v. United States,* 90 F.2d 462, 465 (Cir. 7, 1937).

Por otro lado, la encuesta del jurado puede ser renunciada por el acusado, lo que puede deducirse de su omisión de hacer oportunamente la petición. El momento apropiado para hacer la solicitud es después que se ha anunciado el veredicto y antes de haberse pronunciado la sentencia. *Jaca Hernández v. Delgado,* 82 D.P.R. 402, 413 (1961). En cuanto a este particular no parece haber disparidad de criterios entre las diferentes jurisdicciones estatales, la federal y la nuestra. Véase *Jaca Hernández, supra,* a la pág. 413 y casos allí citados.

En el caso ante nos, toda vez que Perfecto Desardén inicialmente y por error fue exonerado de todos los cargos que le fueran imputados, ciertamente, éste no tenía razón alguna por la cual solicitar una encuesta del jurado. De igual forma y por las mismas razones el foro de instancia no hubiere tenido que acceder a tal solicitud en aquel momento, ya que no había razón para ello.

Posteriormente, cuando surge a la luz la aparente discrepancia en los veredictos inicialmente aceptados por el tribunal, es este quien *muto proprio* procede a realizar la referida encuesta. Entendemos, que aunque la misma fue llevada a cabo diecinueve (19) días después de haberse aceptado dichos veredictos, la misma fue una rigurosa y suficiente para verificar el error acaecido y corroborar, sin lugar a dudas, la verdadera intención y voluntad del jurado, brindándole a Desardén su derecho estatutario a realizar una encuesta del jurado y subsanando de este modo cualquier consecuencia que dicha irregularidad le hubiere causado a éste. Es decir, la encuesta realizada cumplió cabalmente con sus propósitos.

Nótese, además, que la encuesta o procedimiento que se llevó a cabo y las preguntas realizadas en la misma fueron elaboradas (confeccionadas) en conjunción y con la anuencia de ambas partes; esto es, con la anuencia tanto del Ministerio Público como la de la representación legal de Desardén. Es decir, no surge del récord que el representante legal de Desardén ni este último objetaran o se opusieren a la forma, manera y extensión de la encuesta.

Por último cabe señalar, que el derecho a realizar una encuesta al jurado es uno estatutario y no constitucional. Tampoco constituye un elemento esencial del debido procedimiento de ley garantizado localmente por la Enmienda Sexta de la Constitución Federal. En ese sentido, el mero hecho de que haya habido una irregularidad en el procedimiento llevado a cabo al efecto de que la encuesta se realizó diecinueve (19) días después y luego de disuelto el jurado, ello de por sí no constituye el tipo de error sustancial que conllevaría automáticamente la revocación del dictamen. Véase y comparese *Jaca Hernández v. Delgado, supra,* a la pág. 406. y nota al calce Núm. 17 a la pág. 415.

Resolver lo contrario en el presente caso, como expusiéramos antes, socavaría y vulneraría la institución del jurado, además de ir en contra de todo el sentido de la justicia misma.

## III

Para analizar el primer error, identificado como *"Error (A)"* y que trata sobre insuficiencia de prueba, en su justa perspectiva, es pertinente y necesario un resumen de los hechos según surgen éstos de la Exposición Narrativa de la Prueba (E.N.P.) que certificara y aprobara como correcta el foro de instancia. En lo concerniente a la E.N.P. nos circunscribiremos, específicamente, a los hechos ocurridos el 3 de junio de 1991; hechos por los cuales el jurado rindió un veredicto de culpabilidad contra Desardén por el delito de violación técnica en el caso Crim. Núm. HO-94-G-0079. ■

Para la fecha de los hechos pertinentes Desardén tenía una edad cronológica aproximada de cuarenta y cinco (45) años y la perjudicada, Madelyne González tenía una edad cronológica de once (11) años. Los hechos ocurrieron el 3 de junio de 1991 en el hogar de la víctima, localizado en el Bo. Colombia del municipio de Mayaguez.

Como primer testigo de cargo declaró la perjudicada **Madelyne Medina González**. Declaró, en síntesis y en lo pertinente, que nació el 23 de julio de 1979 y que tenía quince (15) años de edad. Para

la fecha de los hechos en cuestión, 3 de junio de 1991, estudiaba y tenía once (11) años de edad. Hacía dos o tres años que vivía allí. Para esa fecha conocía a Desardén Valentín, a quien identificó en corte abierta. Desardén había comenzado a visitar su casa dos o tres semanas antes y su papá se lo había presentado como sobrino de él y primo de ella. Veía con frecuencia a Desardén en el patio de su casa, pues su papá le había dado permiso a éste para tener sus animales allí. Que éste vivía en el residencial público Frankling Delano Roosevelt en Mayaguez con su esposa e hijos y trabajaba recogiendo basura en el Municipio de Mayaguez.

Atestó además, que Desardén iba todos los días a darle comida a los animales de las dos de la tarde (2:00 P.M.) en adelante. A esa hora usualmente ella estaba en la escuela, pero que ese día, 3 de junio de 1991, ella estaba de vacaciones razón por la cual se encontraba en su casa. Estando allí ese día y en horas de la tarde, mientras veía televisión junto a sus hermanos, Desardén la llamó desde el patio y le pidió que le ayuuara a buscar una pieza de radio. ■ Bajó de la casa al sótano, donde su papá guardaba todo tipo de piezas de radio, y comenzó a buscar la pieza con Desardén. Bajó porque éste la había llamado y ella tenía confianza con él, ya que era su primo; es decir, lo acompañó porque confiaba e iba a hacer nada, ya que era familia. Continuó atestando, que estando en el sótano Desardén se le paró al lado y empezó a tocarle sus partes íntimas, los senos y la vagina. El se fue detrás de ella acariciándola, solamente le tocaba la vagina cuando estaba detrás de ella. Después la puso contra una pared, le bajó los *"panties"*, le puso la *"cosa"* de ella a la altura de la cintura de él y le introdujo el pene en la vagina. Cuando la puso contra la pared ella se quedó inmóvil porque no creía lo que él le estaba haciendo, ya que era familia. Tenía puesta una falda y al quitarle los *"panties"* ella estaba de pie y se los bajó completitas y ahí fue cuando la alzó con sus manos para arriba y le introdujo el pene. El estaba vestido y se bajó el pantalón. Desardén con una mano la aguantaba a ella y con la otra se bajó el pantalón y el calzoncillo. Cuando ella estaba arriba de él, la tenía agarrada y ella no tocaba el piso, quedó con las piernas a la altura de la cintura de él. Cuando Desardén le introdujo el pene, ella sentía que le dolía y trataba de gritar, pero no podía porque él le decía que se callara. Posteriormente, cuando Desardén terminó de introducirle el pene y la baja, ella puede ver que bota algo blanco. Desardén estuvo como treinta (30) minutos allí con ella.

Declaró además, que cuando Desardén terminó de hacerle eso le dijo a ella que no se lo dijera a nadie, porque si no él se iba a meter al cuarto y la iba a matar y se iba a ir de viaje. Después éste le pidió un vaso de agua y ella subió a la casa a buscárselo, pero le dijo a su hermana Evelyn --quien tenía ocho (8) años para esa fecha-- que la acompañara a llevarle el vaso de agua a Desardén porque tenía miedo. Después de eso, él se va y ella y su hermana suben para la casa. Declaró que estaba nerviosa, llorando y que su hermana le preguntó que le pasaba y entonces ella le contó que Desardén había abusado de ella y que la había amenazado de muerte si decía lo ocurrido. Ese día, su mamá estaba trabajando en una fábrica de coser y su papá vendiendo refrescos. Sus hermanos Ernesto (de 12 años), Heriberto (de 19 a 20 años), Manuel y Antonio (de 10 años), sí se encontraban en la sala de la casa a esa hora. No obstante, no le dijo a ellos lo ocurrido, porque tenía miedo de que Desardén la matara.

Como segundo testigo de cargo declaró la hermana de la perjudicada **Evelyn Medina González**. Esta declaró en términos similares a su hermana en cuanto a que conocía a Desardén por razón de que su papá se lo había presentado como primo de ella, que para esa fecha éste vivía en el caserío Roosevelt, que iba a su casa todos los días de 3:00 a 4:00 de la tarde a atender unos animales que tenía allí y que a veces a esa hora Madelyne se encontraba abajo o arriba en la casa. Vió varias veces a su hermana Madelyne hablar con Desardén sobre los animales y otras cosas, pero que no le ponía mucha atención.

Declaró, además, que los animales estaban en la parte de atrás de la casa y que debajo de la misma Desardén tenía como una casita que había hecho para poner la purina y las cosas *("sótano")*. En una ocasión, no recuerda la fecha, vió a Madelyne dentro de la misma hablando con Desardén. Varias veces, como tres, vió a Desardén tratando de alzarle la falda a Madelyne en el cuartito y en el patio; que unas veces los veía hablando y otras veces veía a Desardén tratando de halar a Madelyne dentro de la casita. En otra ocasión, no recuerda la fecha, observó por un boquete en un *"zinc"* que Desardén estaba sentado junto a Madelyne en el cuarto debajo de la casa y éste le dijo que se levantara la falda y que, como ella no quizo, él trató de alzársela. En eso, Desardén se dió cuenta de que ella (Evelyn) observaba por los rotos del *"zinc"* y le tiró con una piedra y ella se fue para arriba a esperar que

Madelyne subiera. Después de esa ocasión no volvió a asomarse por el roto porque se asustó. Había mirado en esa ocasión ya que Madelyne le había contado que Desardén le hacía cosas que no le gustaban, la besaba, se tiraba encima de ella y como no tenía mucha confianza en lo que Madelyne le decía, quería averiguar si era verdad o no. Luego de esa ocasión en que Desardén tiró la piedra, éste tapó el roto del *"zinc"* con un *"screen"*.

Como tercer testigo de cargo declaró el agente del orden público Blas Ramírez Valentín, quien se desempeña en la Unidad de Delitos Sexuales y quien estuvo a cargo de la investigación de las querellas radicadas en el presente caso. Testificó, en lo pertinente, que conoce a Desardén desde marzo de 1994, fecha en que una joven y su madre presentaron una querella contra éste por unas violaciones.

En su contrainterrogatorio sostuvo que la querella fue presentada por una joven y la mamá de ésta, de nombre Sonia. Las entrevistó a ambas y luego las llevó ante el fiscal McCandles. Luego llevó a la joven al Centro Médico para un examen ginecológico, tras lo cual radicó la querella. Sostuvo, además, que no entrevistó a nadie más con relación al caso; que no entrevistó a los vecinos por no creerlo pertinente ni tampoco a los hermanos de la alegada perjudicada, por no haberlos encontrado en la casa en ninguna de las tres ocasiones en que visitó el lugar.

Como cuarto testigo de cargo declaró el Dr. Rafael Méndez Rodríguez, quien trabaja en el Departamento de Ginecología del Centro Médico de Mayaguez desde hace unos 4 años. Testificó que allá para el 2 de mayo de 1994, se encontraba trabajando en el Centro Médico de Mayaguez cuando, en horas de la noche, atendió a la perjudicada Madelyne Medina, quien se encontraba acompañada de su mamá y una trabajadora social. Esta alegaba ser víctima de violación y sospechaba estar embarazada. Examinó a Madelyne y encontró que ésta presentaba una anatomía característica de una mujer que había tenido relaciones sexuales en varias ocasiones, pero que no podía determinar el tiempo que llevaba teniendo las mismas.

Continuó declarando que ella le narró que fue allí para una evaluación ginecológica porque había sido víctima de violación por parte de un pariente de ella cuando tenía 12 años y que llevaba dos años siendo víctima de abusos sexuales. Los hallazgos encontrados en Madelyne eran compatibles con su versión de que llevaba sosteniendo relaciones sexuales por bastante tiempo --varios años-- sin poderse precisar exactamente por cuanto tiempo.

Por otro lado, la prueba de defensa consistió de los siguientes testigos:

**Sonia González**

*Esta testigo fue renunciada por el Ministerio Público.*

Declaró, en lo pertinente, que es la madre de Madelyne Medina González. Que reside en el Barrio Colombia junto a sus hijos Heriberto, Manuel, Ernesto, Evelyn y Antonio.

Que para el 3 de junio de 1991 al 4 de mayo de 1994 vivió con sus hijos antes mencionados en el mismo lugar y que además vivía con ella para esa fecha su hija Madelyne. Que para la fecha del juicio ya Madelyne no vivía con ella, porque se había ido a vivir con su novio José desde el 24 de mayo de 1994. Indicó que para el 1991 trabajaba como operaria de máquina en una fábrica en la zona industrial de Mayaguez. Su esposo era vendedor ambulante de refrescos y se iba a trabajar cuando ella regresaba de su trabajo a las 4:00 p.m. Para el 1991, todos sus hijos estudiaban, dijo.

Declaró que conoce al apelante Desardén Valentín desde hace tiempo, cuando su esposo -- que era tío de éste -- lo llevó a su casa para que le ayudara a construirla.

La señora González declaró que se enteró de la versión de su hija Madelyne en 1994. Indicó que se enteró de que su hija no estaba asistiendo a la escuela. Fue al plantel y los maestros de Madelyne le confirmaron que hacía dos semanas que no asistía a clases. Agregó que esa tarde cuando su hija llegó, la confrontó con la información recibida. Le preguntó donde había estado esas dos semanas y Madelyne le mintió contestándole que había ido a la escuela, por lo que se molestó y le dio varias

bofetadas. En ese momento, según dijo, su hija le dijo que no la golpeara más, pues estaba embarazada. La[sic] preguntó de quién era el bebé y ella le contestó que era de José, el joven con quien se encontraba conviviendo al momento del juicio.

La testigo declaró que fue cuando le dijo a Madelyne que iba a denunciar a José con la Policía, que ésta mencionó por primera vez que antes de tener relaciones sexuales con José, ya el apelante Desardén Valentín *"le había hecho el daño"*.

Indicó la señora González que al oír esto se dirigió al cuartel en compañía de Madelyne para denunciarlos a ambos y que en el camino se encontró al apelante y lo confrontó.

Declaró que el apelante Desardén Valentín visitaba su casa cuidar unos animales que tenía allí. Que se portaba muy bien con los hijos de ella.

Durante el contrainterrogatorio que en adición a quedarse con José durante el horario escolar, se enteró después a través de la trabajadora social que ella se escapaba en las noches cuando todos en su casa dormían para estar con él. Negó que la maltratara. Indicó que no le hablaba a Madelyne desde mayo 1994, ya que ésta se fue sin su permiso a vivir con José, alegando que quería estar con él.

Dijo que se enteró de las acusaciones de su hija contra el apelante Desardén Valentín cuando ésta se lo dijo. Que presentó la querella en mayo de 1994, pero que no recordaba qué día específico. Aseguró que en ninguna ocasión, su otra hija Evelyn. le dijo que algo le sucediera a Madelyne, o que el apelante mirara mal a ésta o que la estuviera molestando.

Declaró que en el año 1991 durante los día de la semana estaba en el trabajo y los fines de semana su casa. Desde junio de 1992 hasta febrero de 1994 estaba por lo general en su casa, ya que para esa fecha ya no estaba trabajando.

La testigo señaló además que cuando fue a presentar la querella al Cuartel de la Policía el que la atendió (cuyo nombre no recuerda) le informó que ese asunto era de la competencia de la Unidad de Delitos Sexuales. Indicó que al otro día fue a la Unidad de Delitos Sexuales. Que al policía que originalmente la atendió no le dio información y por eso fue referida a Delitos Sexuales. Que entonces desconocía la dirección del apelante Desardén. Que luego al presentar la querella, estaba acompañada de Madelyne y que fue ella misma quien la presentó.

**Ernesto Medina González**

Declaró que tiene 17 años y que para el año 1991 vivía en el Barrio Colombia con sus padres y hermanos: Madelyne, Antonio, Manuel y Evelyn. Que desde 1991 cuando cursaba el sexto grado, hasta la fecha de su declaración en el juicio, su horario regular comenzaba repartiendo periódicos de cinco a seis de la madrugada. Luego se iba a la escuela, a la que entraba a las 8 a.m. y salía a las 3 p.m. Que regresaba a su casa a eso de las 3:05 de la tarde y a esa hora le daba comida a los animales que tenía en el patio de su casa. Que en adición a él, también su hermana Madelyne y el apelante Desardén Valentín tenían animales en el patio de la casa de sus padres.

El testigo aseguró que en todo el tiempo que le daba comida en las tardes a su animales, hasta el 1994, no notó nada fuera de lo normal. Que el apelante iba todos los días a su casa a darle comida y atender sus animales y que el testigo lo veía allí porque él estaba haciendo lo mismo con sus animales.

Indicó a preguntas del Ministerio Público que el apelante Desardén Valentín tenía los animales en su casa, porque en el apartamento donde vivía en el residencial Roosevelt no los podía tener. Que guardaba la comida de éstos en baldes de pintura de cinco galones, los cuales guardaba dentro de una casita que él mismo construyó debajo de la casa de su mamá, para que el alimento no se dañara.

Ernesto declaró que en cuanto el apelante terminaba de alimentar sus animales se iba. Dijo que en ocasiones veía al apelante entrar al cuartito que hizo debajo de la casa, ya que allí él preparaba la comida que le daba a sus animales. Que en ocasiones él también entraba allí. El testigo indicó que su hermana Madelyne en ocasiones le alimentaba los animales cuando él no podía hacerlo porque iba al

gimnasio. Pero aun en esas ocasiones, él llegaba de la escuela y permanecía en su casa hasta las 5 p.m., hora en la que salía para el gimnasio.

Declaró que el cuarto ubicado debajo de la casa de su mamá fue construido por el apelante Desardén Valentín después de la muerte de su padre.

**Wilfredo Díaz Vargas**

El agente Díaz Vargas fue presentado por el Ministerio Público como testigo de refutación. Declaró que conoció a la Sra. Sonia González el 1ro. de mayo de 1994. Ella acudió a eso de las 10 a.m. al Cuartel de Distrito de la Policía de Mayaguez, donde se encontraba él trabajando, buscando asesoramiento. Según el agente Díaz Vargas, la Sra. González le indicó que su hija había sostenido relaciones sexuales con una persona, pero que la hija no le quería dar información. Ante la situación, dijo el testigo, refirió a la querellante a la Unidad de Delitos Sexuales. Que ella entonces se marchó y no regresó durante su turno. Que hizo constar la querella en su informe, que identificó en sala.

A preguntas de la defensa, el testigo declaró que la Sra. González ya se encontraba en el cuartel cuando él llegó ese día. Que ante la información que le ofreció la Sra. González en el sentido de que su hija no quería describir la persona con la que había sostenido relaciones sexuales, se comunicó con el agente Blas Ramírez, de la Unidad de Delitos Sexuales.

Declaró que el agente Ramírez le indicó que citara a la querellante para que al día siguiente le visitara acompañada de su hija.

**Blas Ramírez Valentín**

Este testigo fue presentado por la defensa como prueba de refutación.

Indicó que conoció a la Sra. Sonia González el 2 de mayo de 1994. Que ella compareció acompañada de su hija Madelyne a una citación en la Unidad de Delitos Sexuales, en la que él trabaja. Que la Sra. González le dijo que su hija había sido violada. El entrevistó a Madelyne y redactó un informe Tipo sobre el delito de Violación. Que la información que él incluyó en ese informe se la ofreció Madelyne, quien identificó al apelante Desardén Valentín como su agresor.

**IV**

Plantea Desardén Valentín que la prueba antes reseñada es insuficiente en derecho para establecer su culpabilidad más allá de duda razonable. No le asiste la razón.

Como norma general se ha establecido que la convicción de todo acusado tiene que estar sostenida por prueba que establezca más allá de duda razonable todos los elementos del delito y la conexión de éste con los mismos. La prueba debe ser suficiente en derecho para derrotar la presunción de inocencia que cobija al acusado. Art. II, Sección 11, Const. E.L.A. Para que el Ministerio Fiscal cumpla con su deber de probar la culpabilidad del acusado más allá de duda razonable, la prueba de cargo ha de ser no sólo suficiente, demostrando todos los elementos del delito imputado, sino, además, satisfactoria; es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación, o en un ánimo no prevenido. *Pueblo v. Cabán Torres,* 117 D.P.R. 645 (1985); *Pueblo v. Pagán Ortiz,* 131 D.P.R. ___ (1992), **92 J.T.S. 56**; *Pueblo v. Rodríguez Román,* 128 D.P.R. ___ (1991), **91 J.T.S. 26**. Precisamente se ha definido la duda razonable como aquella insatisfacción o intranquilidad en la conciencia del juzgador de hechos sobre la culpabilidad del acusado luego de desfilada la totalidad de la prueba de cargo. *Pueblo v. Robles González,* ___ D.P.R. ___ (1990), **90 J.T.S. 41**. No es pues, la duda razonable, una duda imaginaria o especulativa. *Pueblo v. Bigio Pastrana,* 116 D.P.R. 748 (1985).

Por otro lado, la apreciación del juzgador de los hechos sobre la culpabilidad de un acusado es una cuestión mixta de hechos y de derecho, por lo que la determinación de culpabilidad más allá de duda razonable es revisable en apelación como cuestión de derecho. *Pueblo v. Carrasquillo,* 102 D. P. R. 545 (1974); *Pueblo v. Cabán, supra*; *Pueblo en interés del menor F.S.C.,* 129 D.P.R. ___ (1991), **91 J.T.S. 68**. Siendo ello así, un tribunal de apelaciones no está impedido de examinar si la prueba

aportada por el Ministerio Público satisfizo el *quántum* de prueba constitucionalmente requerido para vincular al imputado con el *corpus delicti,* y razón por la cual no se ha vacilado en dejar sin efecto un fallo condenatorio cuando el análisis ponderado de dicha prueba causa o produce duda razonable y fundada sobre la culpabilidad del acusado. *Pueblo v. Somarriba García,* 132 D.P.R. ___ (1992), **92 J.T.S. 109**; *Pueblo v. Maisonave Rodríguez,* 129 D.P.R. ___ (1991), **91 J.T.S. 67**; *Pueblo v. Rivero, Lugo y Almodóvar, supra*; *Pueblo v. Carrasquillo, supra*; *Pueblo v. Cabán, supra.*

No obstante lo anterior, un tribunal apelativo no debe revocar una convicción a base de un planteamiento de insuficiencia de prueba, que se reduce a uno de credibilidad de testigos, en ausencia de indicios de prejuicio, pasión, parcialidad o error manifiesto. *Pueblo v. Hernández Mercado,* 126 D.P.R. ___ (1990), **90 J.T.S. 74**, a la pág. 7794; *Pueblo v. Acabá Raíces,* 118 D.P.R. 369, 375-376 (1987). La razón es obvia: por su presencia directa en el juicio, el juzgador de instancia --jurado o tribunal de derecho-- está en mejor posición que el tribunal apelativo para poder aquilatar la veracidad de las declaraciones de los testigos, ya que tuvo la oportunidad de verlos y escucharlos al hacer sus declaraciones. Es decir, el juzgador de instancia está en mejor condición de apreciar la conducta total o comportamiento *("deamenor")* de los testigos al declarar, lo que es imposible captar de una transcripción o exposición narrativa de la prueba. *Pueblo v. López Pérez,* 106 D.P.R. 584 (1977); *Pueblo v. Ruiz Ramos,* 125 D.P.R. ___ (1990), **90 J.T.S. 16;** *Pueblo v. Rivero, Lugo y Almodóvar,* 121 D.P.R. 454 (1988).

Teniendo en mente este marco conceptual sobre la duda razonable, veamos si el Ministerio Fiscal cumplió con dicho requisito en el caso de autos.

El Art. 99 del Código Penal, *supra*, señala que el delito de Violación es cometido por *"toda persona que tuviere acceso carnal con una mujer que no fuere la propia...".* En el inciso (a) del referido artículo se establece una de las modalidades del delito que se configura cuando el ofensor tiene acceso carnal con una mujer menor de catorce (14) años.

Por otro lado, y con el propósito de definir más claramente el delito de Violación, el Art. 100 del Código Penal, 33 L.P.R.A. sec. 4062, establece que:

*"El delito de violación esencialmente consiste en el ultraje inferido a la persona y sentimiento de la mujer. La emisión no es necesaria y cualquier penetración sexual por leve que fuere, bastará para consumar el delito".*

Es decir, como norma general, se configura el delito de Violación con los siguientes elementos: (1) tener acceso carnal, lo cual requiere que haya penetración aunque leve o lígera, sin ser necesaria la eyaculación; (2) con una mujer que no fuere la propia; (3) sin su consentimiento o con su consentimiento viciado. *Pueblo v. Pérez Rivera,* ___ D.P.R. ___ (1991), **91 J.T.S. 80**; D. Nevárez Muñiz, *Código Penal de Puerto Rico Comentado,* Colegio de Abogados, San Juan, 1986, págs. 179-181.

Ahora, cuando el delito se lleva a cabo al amparo de la modalidad contemplada en el inciso (a) del referido Art. 99 --violación técnica-- no es pertinente si la mujer prestó el consentimiento al acto sexual, puesto que por razón de su **inmadurez sicofisiológica** el ordenamiento jurídico no le reconoce capacidad para prestar legalmente dicho consentimiento. Bajo esta modalidad no se requiere violencia y el consentimiento dado por la mujer, si alguno, siempre estará viciado. *Pueblo v. Pérez Rivera, supra*, a la pág. 8966.

Por otro lado, nuestro Tribunal Supremo ha resuelto que no se requiere que la prueba testifical contenga sórdidos detalles ni palabras especiales para establecer el elemento de contacto carnal o penetración. Así,pues, en *Pueblo v. Pacheco Padilla,* 92 D.P.R. 894, 897 (1965), se dijo que con *"la expresión de haber tenido relaciones sexuales generalmente queda establecido el hecho por saberse lo que ello significa".* Igualmente se expresó en *Pueblo v. Colón,* 81 D.P.R. 814, 819 (1960) y en *Pueblo v. Díaz,* 35 D.P.R. 230, 232 (1926). Tampoco es necesario prueba científica o de otra índole para corroborar tales declaraciones. *Comisión v. Giménez Muñoz,* 109 D. P.R. 715 (1980).

En el caso ante nos la prueba de cargo estableció que la perjudicada no era la esposa de Desardén y

que ésta, a la fecha de los hechos, era menor de catorce (14) años.

La impugnación de Desardén se dirige más bien al elemento del acceso carnal. Según éste, de la prueba desfilada en el juicio surgen una serie de contradicciones e inconsistencias que arrojan serias dudas sobre la versión de la perjudicada acerca de la forma y manera en que ocurrió la alegada violación el 3 de junio de 1991. Específicamente y en primer lugar, alega que los hechos relatados por la perjudicada resultan ser improbables toda vez que, según ésta, luego de la violación, quedó en una condición física notablemente alterada, es decir, lloraba, estaba nerviosa, sangraba profusamente y tenía su ropa interior en su mano, y que no obstante ello y del hecho de sus hermanos haberla visto en dicho estado, sorprendentemente, ninguno de éstos se percató de lo sucedido a ésta. No estamos de acuerdo.

Habiendo examinado tanto los testimonios de los testigos de cargo, específicamente el de la perjudicada, así como los de la defensa, no tenemos duda alguna que de éstos surgen claramente los elementos constitutivos del delito de violación técnica. El testimonio de la perjudicada, escuchado, evaluado y creído por el jurado, constituye prueba suficiente en derecho para sostener tal convicción. Es decir, no tenemos dudas que la prueba presentada por el Ministerio Fiscal produce la certeza o convicción moral, en una conciencia exenta de preocupación, que requiere nuestro ordenamiento jurídico y que quedaron probados todos los elementos del delito de violación técnica que se le imputó a Desardén en el caso de autos, más allá de duda razonable. Creemos que esa fue la apreciación del jurado y no se nos han justificado las circunstancias para intervenir y dejar sin efecto dicha apreciación. *Pueblo v. Lebrón,* 113 D.P.R. 818 (1982). Más aún, en casos de esta naturaleza, en que la forma de hablar, comportamiento, explicaciones, gestos y demás detalles perceptibles, resultan esenciales para aquilatar adecuadamente la sinceridad de los testimonios. *Ortiz v. Cruz Pabón,* 103 D.P.R. 939, 947 (1975). El jurado evaluó todos estos testimonios a la luz de los contrainterrogatorios de la defensa y aún así, encontró a Desardén culpable del delito de violación técnica. Esa fue la apreciación del Jurado. No podemos desde este Foro Apelativo, contando con tan sólo un expediente frío e inexpresivo, sustituir esa apreciación. *Pueblo v. Rivera Robles,* 121 D.P.R. 858.

Por los fundamentos expresados confirmamos la sentencia del Tribunal de Primera Instancia, Sala Superior de Mayaguez, que declaró a Desardén culpable y convicto del delito de violación técnica en el caso HO-94-G-0079.

Lo acordó el Tribunal y lo certifica la señora Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 97 DTA 124

**1.** En la Resolución emitida por el foro de instancia para corregir el veredicto y conformarlo a la verdadera voluntad e intención del jurado, expresó dicho foro lo siguiente: *"por razones de seguridad que a veces afectan y están presentes en nuestras decisiones, decidimos excusar el jurado para que luego la secretaria de sala leyera en alta voz el veredicto y dictar el fallo conforme lo que interpretamos".* Véase Resolución del 12 de mayo de 1995, a la pág. 21; pág. 81 del Alegato del Apelante.

**2.** Coetáneamente con su recurso de apelación, Desardén presentó ante el foro de instancia una solicitud de fianza en apelación apoyado en que había comparecido a todas las vistas que fue requerido y que no representaba un peligro para la comunidad. En consideración a la petición hecha por Desardén, el foro de instancia le fijó a éste una fianza en apelación de $4,000.00 ó del diez porciento (10%) en depósito; la cual prestó. La imposición de dicha fianza, fue recurrida por el Ministerio Público ante éste Tribunal mediante el correspondiente recurso de *certiorari* (Núm. KLCE-95-00391); recurso que fue denegado mediante Resolución del 29 de junio de 1995.

**3.** Si al rendir un veredicto de culpabilidad el tribunal considerare que el jurado se ha equivocado en la aplicación de la ley, el juez que lo presida podrá explicar al jurado sus razones y ordenarle que vuelva a considerar el veredicto. Si después de esto se rindiere el mismo veredicto, este será aceptado por el tribunal.

Nada de lo aquí dispuesto será aplicable a un veredicto absolutorio el cual deberá ser aceptado siempre por el tribunal.

**4.** Si el veredicto fuere tan defectuoso que el tribunal no pudiere determinar la intención del jurado de absolver o condenar al acusado por el delito bajo el cual el acusado pudiera ser convicto de acuerdo con la acusación, o no pudiere determinar en qué cargo o cargos el jurado quiso absolver o condenar al acusado, el tribunal podrá instruir al jurado para que reconsidere dicho veredicto y exprese claramente su intención. Pero si el jurado persistiere en rendir el veredicto defectuoso, tal veredicto será aceptado, y el tribunal dictará un fallo absolutorio.

**5.** Aunque en el caso de *Huett, supra,* el caso se ventiló por tribunal de derecho, la esencia de lo allí resuelto es de aplicación al caso que nos ocupa.

**6.** La Regla 31(d) de las de Procedimiento Criminal (Fed. Rules Cr. Proc., rule 31(d), 18 U.S.C.A.), que rige el procedimiento de las causas criminales en las cortes federales, permite la encuesta del jurado. Dicha regla dispone como sigue: *"When a verdict is returned and before it is recorded the jury shall be polled at request of any party or upon the court's own motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged."*

**7.** Las acusaciones radicadas en este caso por el delito de violación se referían a hechos ocurridos en cinco (5) fechas distintas, a saber: 1) HO-94-G-0079-por hechos ocurridos el 3 de junio de 1991; 2) HO-94-0078-por hechos ocurridos el 5 de junio de 1991; 3) HO-94-0081-por hechos ocurridos del 6 de junio de 1991 al 22 de julio de 1993; 4) HO-94-G-0080-por hechos ocurridos del 24 de julio de 1993 al 26 de febrero de 1994; y 5) HO-94-G-0082-por hechos ocurridos el 27 de febrero de 1994. El jurado encontró culpable a Desardén únicamente por los hechos ocurridos el 3 de junio de 1991, exonerándolo en los demás casos.

**8.** Alegadamente, su papá arreglaba radios y guardaba las piezas en un cuartito hecho de bloques en el sótano de la casa.